**DENVER & RIO GRANDE WESTERN RAILROAD COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

Nos. 6270, 6271.

United States Court of Appeals
Tenth Circuit.

May 27, 1960.

Stanley Worth and Jules G. Korner III, Washington, D. C. (J. Gilmer Korner, Jr., Blair, Korner, Doyle & Worth, Washington, D. C., and T. A. White, General Attorney, Denver, Colo., of Counsel, on the brief), for petitioner.

Grant W. Wiprud, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Carolyn R. Just, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before PICKETT and BREITENSTEIN, Circuit Judges, and SAVAGE, District Judge.

BREITENSTEIN, Circuit Judge.

These are petitions to review decisions of the Tax Court [1] affirming actions of the Commissioner in assessing deficiencies against the petitioning railroad,[2] a common carrier by rail operating principally in the states of Colorado and Utah. Case No. 6270 involves deficiencies for the years 1951 and 1952 in the amounts of $32,191.99 and $102,325.05, respective-

---

1. The findings of fact and opinion of the Tax Court are reported at 32 T.C. 43.

2. Hereinafter referred to as the taxpayer.

ly. Case No. 6271 concerns a deficiency for the year 1953 in the amount of $232,-451.56.

■ The first issue is whether the taxpayer is entitled to deduct in each of the years the amount of local benefit taxes levied by the Moffat Tunnel Improvement District, which was created by a 1922 act of the Colorado legislature [3] to provide for a transportation tunnel under the continental divide. The District includes all of four, and portions of five other, Colorado counties. The taxpayer paid and deducted, on account of Moffat District taxes, $11,737.47 in 1951, $9,778.08 in 1952, and $9,748.17 in 1953. From statements of the Moffat District the Commissioner determined that 49% of the deductions were properly allocable to maintenance and interest charges and were allowable. He disallowed the remaining 51%. The apportionment made by the Commissioner is not challenged. The claim is that the entire amount of such taxes is deductible.

Section 23(c) (1) (E) of the 1939 Internal Revenue Code, as amended, 26 U.S.C.A. § 23(c) (1) (E) allows as a deduction, from gross income in the computation of net income, taxes paid or accrued within the taxable year, except taxes assessed against local benefits "of a kind tending to increase the value of the property assessed." As to such taxes a deduction is allowed only as to so much thereof as is "allocable to maintenance or interest charges." Taxpayer argues that the local improvement in question did not tend to increase the value of the assessed property.

There is both legislative and judicial determination contrary to the position of the taxpayer. The authorizing legislation declares that the construction of the facilities provided "will be of especial benefit to the property within the boundaries of the improvement district." [4] In Milheim et al. v. Moffat Tunnel Improvement District et al., 72 Colo. 268, 279, 211 P. 649, 654, affirmed 262 U.S. 710, 43 S.Ct. 694, 67 L.Ed. 1194, the Colorado Supreme Court held that, in accordance with the express legislative declaration, lands within the District "will assuredly increase in value" with the construction of the tunnel and consequent improvement in railroad transportation.

■ The taxpayer further contends that the tax is deductible under § 164(b) (5) (B) of the 1954 Internal Revenue Code, 26 U.S.C.A. § 164(b) (5) (B), and the provisions of such section are declaratory of what was well-settled law prior to their enactment. Section 164(b) (5) (B) provides for the deduction of all taxes levied by a special improvement district if; (1) the district covers the whole of at least one county; (2) at least 1,000 persons are subject to the tax; and, (3) the district levies the assessment annually at a uniform rate. Under this section, Moffat District Taxes are admittedly deductible in full.[5] The difficulty is that the taxpayer insists upon a retroactive application. To sustain such position it relies upon the report of the Senate Finance Committee on the 1954 House bill to revise the internal revenue laws, particularly the following portion thereof: [6]

"Subsections (a), (b), and (c) of section 164 incorporate provisions contained in section 23(c) of the 1939 Code. There is some rearrangement of the provisions, particularly subsection (c), but no substantive change is made."

Taxpayer interprets the phrase, "but no substantive change is made," as a declaration that no substantive change is made from § 23(c) of the 1939 Code. We do not agree. A reading of the Senate report adequately discloses that the

3. Colo.Rev.Stat.Ann. §§ 93-1-1 to 93-1-23 (1953).

4. Colo.Rev.Stat.Ann. § 93-1-1 (1953).

5. See Rev.Rul. 55-284, 1955-1 Cum.Bull. 25.

6. S.Rep. No. 1622, 83d Cong., 2d Sess., p. 196, 3 U.S.C. Cong. & Adm.News (1954), pp. 4621, 4831.

phrase relied upon has no relation to the deductibility of special improvement taxes but refers to the fact that the Senate had made no substantive changes in this portion of the House bill as originally drafted. The inclusion in the 1954 Code of numerous new provisions which were not in § 23(c) of the 1939 Code and the amendments made to that section show that the Senate report could not mean that no changes were made.[7]

In determining this issue against the taxpayer the Tax Court relied upon its decision in Western Products Company v. Commissioner of Internal Revenue, 28 T.C. 1196, 1215, a case involving the deductibility of Moffat District taxes and holding that § 164(b) (5) (B) of the 1954 Code was not declaratory of prior law. It is clear to us that the 1954 Code substantially changed the law relating to the deductibility of special improvement taxes. The fact that Moffat District taxes are now deductible does not mean that they were deductible before the 1954 Code. The conclusion of the Tax Court on this issue was correct.

The second issue relates to the valuation base of certain of taxpayer's properties for determination of gain or loss. Prior to 1943, the taxpayer, with the permission of the Interstate Commerce Commission, had followed the retirement system of accounting with respect to depreciable roadway properties.[8] The Interstate Commerce Commission,

by order effective January 1, 1943, required, for its purposes, that all steam roads, including the taxpayer, change from the retirement method to the depreciation method with respect to such properties.[9] Upon the application of the taxpayer, the Commissioner granted it permission to change from the retirement method to the straight-line depreciation method on these properties. This permission was granted by what is known as a "Terms Letter" in which the Commissioner imposed certain conditions, among which was the requirement that the taxpayer set up a reserve equal to 30% of the cost of the total depreciable roadway accounts as of December 31, 1942, and to allocate this reserve to the separate accounts in a manner acceptable to the Commissioner.

During the years in question the taxpayer sold, abandoned, or prematurely retired by reason of casualty or obsolescence certain roadway properties covered by the Terms Letter. Deductible losses claimed thereon were computed without adjusting the base value by the 30% mentioned in the Terms Letter. The Commissioner ruled that the 30% adjustment had to be made. As this decreased the base, it also decreased the loss and resulted in the assessment of deficiencies. The Tax Court sustained the Commissioner.

The railroads and the Internal Revenue Service became engaged in a continuing controversy over the tax effects of this

---

7. For example the report stated "your committee has amended section 164 to permit the deduction of taxes assessed by special districts for debt retirement and capital purposes." Ibid., p. 4653. Also the committee stated: "Your committee has amended subsection (b) (5) to provide for the deduction of taxes levied by a special taxing district which covers the whole of at least 1 county and which includes at least 1,000 individuals paying the taxes levied by the special taxing district. The amendment further provides that the deduction is available only if the district levies its assessment annually at a uniform rate on the same assessed value of real property (including improvements) as is used for purposes

of real property taxes generally." Ibid., p. 4831.

8. Under this accounting system no depreciation was deducted on tax returns during the life of a depreciable item. Instead, the entire cost of the asset, less salvage, was charged to operating expenses at the time the item was retired from use for any reason and was claimed as a deduction from gross income on the tax return for that year.

9. Under the depreciation method, also known as the straight-line depreciation method, an annual depreciation figure (determined by the application to the original cost of a percentage which depends on the term of the useful life of the asset) is deducted on the tax return.

change in method of computing depreciation.[10] To settle such controversy Congress enacted the Retirement-Straight Line Adjustment Act of 1958.[11] This act gives the taxpayer the right to elect as to the application of the act, but an election once made is irrevocable. Section 94(e) of the act provides that a taxpayer, who has made the change-over from the retirement to the depreciation method during the period in which this taxpayer made the change, must adjust the basis of the affected property by the amount of the reserve prescribed by the Commissioner in connection with the change-over.

After these petitions for review were filed in this court, the taxpayer elected to avail itself of the provisions of the Retirement-Straight Line Adjustment Act. The Commissioner urges that such voluntary election renders the point moot and requires affirmance of the Tax Court on this issue. The taxpayer also says that the point is moot but urges that instead of affirming the Tax Court we should reverse or remand with directions to vacate.

■ We do not agree that the issue is now moot. The taxpayer petitioned for a redetermination of deficiencies fixed by the Commissioner. One group of these deficiencies concerns the adjustment of the taxpayer's basis for the computation of gain or loss on the disposition of roadway properties by the allocable amounts of the depreciation reserve required by the Terms Letter. The election under the Retirement-Straight Line Adjustment Act does not render abstract or hypothetical the question of the liability of the taxpayer for the deficiencies arising from the adjusted basis. All it does is to render decision unnecessary on the question of whether, without such election, the adjustment would have to be made. The issue is limited to whether the election requires the adjustment and the taxpayer concedes that it does.

Reliance by the taxpayer on United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36, is misplaced. There the removal of the commodity involved from price control terminated the claim of the Government for an injunction against violation of price control regulations. Here the election did not terminate the right of the Commissioner to assess the deficiencies. Instead, it established that right beyond question. While we affirm the Tax Court on this issue we do so because of the election and we express no opinion on the merits of the controversy as discussed in the Tax Court opinion.

The third issue is whether the cost of certain work done on a viaduct in Salt Lake City, Utah, was deductible as an ordinary business expense. The Commissioner held that such cost had to be capitalized and the Tax Court affirmed.

The viaduct was constructed at the expense of the taxpayer in 1913, pursuant to a city ordinance, and carried vehicular and pedestrian traffic over the taxpayer's tracks. After a joint inspection in 1952 by various officials, the taxpayer, upon demand of the city, installed new stringers and floor planks over an 800-foot section of the viaduct to provide adequate foundation for surface paving. The net cost to the taxpayer was $31,-996.22 for which it claimed a deduction as an operating expense.

■ Section 23(a) (1) (A) of the 1939 Internal Revenue Code allows a deduction in the computation of net income of "[a]ll the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Capital expenditures are not deductible as an ordinary business expense.[12] The Supreme Court has said that whether an expenditure is ordinary

10. See S.Rep. No. 1983, 85th Cong., 2d Sess., 3 U.S.C.Cong. & Adm.News (1958) pp. 4791, 4897.

11. P.L. 85–866, 72 Stat. 1606, 1669–1672, §§ 94–95, 26 U.S.C.A. §§ 1016 note, 372

and note. This is included in the Technical Amendments Act of 1958.

12. United States v. Akin, 10 Cir., 248 F. 2d 742, 744, certiorari denied 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed.2d 532. Cf.

and necessary is usually a question of fact.[13] It is not easy to draw the line between capital investments and current expenses,[14] and each case stands on its own facts to such an extent that reasoning by analogy is of little help.

Each party relies on the criteria established by Illinois Merchants Trust Co., etc., 4 B.T.A. 103, 106, to sustain its position.[15] The application of these criteria requires a detailed consideration of the pertinent facts.

As constructed in 1913, the viaduct had two approaches built of steel and concrete. These were connected with an 800-foot floor of wooden stringers and planks topped with surface paving. Some of the stringers and planks were charred by a fire in 1924. An inspection made in 1952 disclosed that proper surface paving could not be maintained under the heavier traffic conditions then prevailing without a renewal and strengthening of the many deteriorated stringers and floor planks. The 1952 rehabilitation consisted of a replacement of all of the floor planks and 85%–90% of the stringers. New stringers were added to strengthen the support of the wood flooring and eliminate wave action which caused breakage of surface paving. Prior to the 1952 work it was impossible to maintain the paving in proper condition. A witness for the taxpayer testified that the useful life of the new timber in the stringers was 25–35 years. The Commissioner required a capitalization of the expense over a period of 15 years.

The expenditure resulted in a substantial restoration, strengthening and improvement of the viaduct. It was not for incidental repairs but for a replacement of a major portion of the viaduct which could no longer be repaired. The improvements so made had a useful life of many years.[16]

The finding of the Tax Court that the expense must be capitalized is fortified by a consideration of § 24(a) (3) of the 1939 Internal Revenue Code which provides that no deduction shall be allowed in respect of "[a]ny amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made." The taxpayer had been allowed depreciation deductions based upon the original cost of the viaduct. Here the expenditure was for restoration and an allowance had been made as the taxpayer had regularly taken depreciation on the original cost. The Tax Court made no mistake in affirming the action of the Commissioner in capitalizing the cost.

---

§ 24(a) (2) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 24(a) (2).

13. Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 88 L.Ed. 171.

14. Cf. Cravens v. Commissioner of Internal Revenue, 10 Cir., 272 F.2d 895, 899.

15. The Board of Tax Appeals there said: "In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure is made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings."

16. In United States v. Akin, supra, 248 F.2d at page 744, it was stated: "But it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year."

The final issue is whether the taxpayer is entitled, in any of the taxable years, to deduct as a worthless debt its basis for Rio Grande Southern Railroad Company bonds. The Commissioner held that it could not take the bad debt deduction and the Tax Court affirmed.

Section 23(k) (2) of the 1939 Internal Revenue Code provides that if any securities [17] "become worthless within the taxable year" the resulting loss shall be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets. Section 117(d) (1) allows, in the case of corporations, losses from the sale or exchange of capital assets only to the extent of gains from such sales or exchanges. Section 117(e) authorizes the carry-over of capital losses under certain conditions.

The taxpayer claimed a long-term capital loss on its 1952 return in the amount of $211,866.83 and a carry-over loss of $9,527.20 on its 1953 return. The claim was that Rio Grande Southern bonds which had a cost basis to the taxpayer of $1,251,823.40 had become worthless during 1952. At the Tax Court hearing the taxpayer amended its petitions claiming alternatively the loss in each of the tax years here involved.

The Rio Grande Southern owned and operated, in southwestern Colorado, a narrow gauge railroad connecting with taxpayer's railroad. In 1890 it issued an undisclosed amount of first mortgage bonds with a July 1, 1940, due date.[18] The taxpayer owned 1,777 of these bonds having a face value of $1,000 each. From the time of the acquisition of the bonds, as a result of corporate reorganization in 1924, the bonds were carried on the taxpayer's books as having a value of $1.00 until that was charged off in 1952.

In 1898 the interest rate on the bonds was cut from 5% to 4%. Rio Grande Southern defaulted on the payment of interest in 1918 and paid no interest thereafter. A bondholders' protective committee was formed in 1921. In 1929 the United States District Court for the District of Colorado appointed a receiver for Rio Grande Southern and in 1945 he applied for permission to abandon the line. Needed financial aid came in the form of a loan from the Defense Supply Corporation, an agency of the United States, and operations were continued.

Losses for the 25-year period immediately preceding 1950 exceeded $5,837,000. In 1951 the court ordered the receiver to suspend operations, and in 1952 the Interstate Commerce Commission authorized abandonment. In the liquidation proceedings which followed, the bonds in question were assigned a fourth priority. The assets were insufficient to pay all third priority claims. In 1953 the court found that the bonds were worthless.

The taxpayer claims alternatively that the bonds became worthless when operations were suspended in 1951, or when the Interstate Commerce Commission authorized the abandonment of the line in 1952, or when the United States District Court declared the bonds worthless in 1953. The Tax Court held that the evidence failed to show that the bonds "had not become completely worthless at some time prior to 1951."

■ In Boehm v. Commissioner of Internal Revenue, 326 U.S. 287, 292 et seq., 66 S.Ct. 120, 90 L.Ed. 78, the Supreme Court considered the deductibility of losses under § 23(e), which allows deductions for "losses sustained during the taxable year," and held that for a loss to be deductible under that section the loss must have been sustained in fact during the taxable year. The language of § 23 (k) (2) is "become worthless within the taxable year." The difference in terminology is not a difference in principle. The rule in Boehm is applicable here.

Before the Boehm decision this court had before it the deductibility of a bad debt under § 23(k) (1), the language of which is identical with that in § 23(k)

---

17. Section 23(k) (3) defines securities to include bonds.

18. Bonds in the face amount of $4,510,000 were outstanding during the period with which we are concerned.

(2), and held that a finding of the Board of Tax Appeals that bonds did not become valueless in the year claimed by the taxpayer was binding on the court of appeals if supported by substantial evidence.[19]

As in the Boehm and Green cases the record here shows identifiable events which occurred before 1951 and which justify the conclusion that the bonds were worthless prior to that year. These include the heavy operating losses, the failure to pay interest after 1918, the formation of the bondholders' committee, the receivership, and, most importantly, the 1945 application of the receiver for permission to abandon the line. The fact that the line operated thereafter with the help of a Government loan does not necessarily show that the bonds had any recognizable value.[20]

■ We may not substitute our inferences for those of the Tax Court. In the circumstances, the Tax Court cannot be said to be wrong as a matter of law in disallowing the deduction.

■ The taxpayer assails the Tax Court decision on the ground that it failed to make a specific finding as to when the bonds became worthless. This was not necessary. The burden was on the taxpayer to establish that the bonds became worthless in one of the tax years in question. If they became worthless before 1951, the first of such years, the time when they so became worthless is not material.

■ We have no doubt that the taxpayer acted in good faith, and we realize that in determining when a security becomes worthless hindsight is much better than foresight. However, value cannot be based on hope alone. The statute requires the objective test of when, in fact, the bonds became worthless and not the subjective test of the taxpayer's reasonable and honest belief of worth or worthlessness. As said by the Supreme Court in the Boehm decision, [21] the difficulties confronting one who in good faith tries to choose the proper year in which to claim a deduction for bad debts are inherent in the statute as now framed. The remedy must come from Congress. It may not be supplied by the courts.

Affirmed.

---

19. Green v. Commissioner of Internal Revenue, 10 Cir., 133 F.2d 76, 77.

20. The record does not show the assets and liabilities of Rio Grande Southern for any year material hereto.

21. Supra, 326 U.S. at page 295, 66 S.Ct. 120, 90 L.Ed. 78.