W. M. ACREE AND ESTATE OF LOUISE ACREE, DECEASED, W. M. ACREE, SURVIVING SPOUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Acree v. Commissioner
Docket No. 4883-71
United States Tax Court
T.C. Memo 1976-187; 1976 Tax Ct. Memo LEXIS 212; 35 T.C.M. (CCH) 813; T.C.M. (RIA) 760187; June 14, 1976, Filed Robert E. Shelton, for the petitioners. Thomas J. Miller, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILLBUR, Judge: Respondent determined deficiencies in the income tax of petitioners as follows: Year
Deficiency
1967
$77,521.70
1968
32,355.75 Due to concessions by the parties the only issue remaining for decision is whether losses arising from loans [1] made by petitioner may be deducted under section 166, section 165, or section 162. [2]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are incorporated by reference. W. M. Acree and Louise Acree, husband and wife, filed joint Federal income tax returns for the years 1967 and 1968 with the district director of internal revenue at Oklahoma City, Oklahoma. At the time the petition was filed in this case, W.M. and Louise Acree resided *214 in Chickasha, Oklahoma. [3]
Petitioner claimed a deduction for bad debts totaling $9051.61 in 1967 and $17,182.72 in 1968. The following amounts remain in dispute: Debtor
1967
1968
Jessie Hooper
$1,176.73
Fredda Foster
1,681.73
Louis Orange
855.46
Oneva Woods
475.00
Ella Benson
1,287.00 [4]
Bunny Sue Kinslow
525.17
Glen Kinslow
10,000.00
Rebel Installation
4,550.37
Petitioner has engaged in the personal loan business since age 16. During the years the loans in question were made and charged off, petitioner maintained a separate loan office in Chickasha, Oklahoma, from which he made personal loans in approximately the sum of $100,000 per year. During this time, petitioner was also president and majority stockholder of The First National Bank of Marlow, Oklahoma (Marlow bank); First National Bank of Verden, Oklahoma (Verden bank); and The Farmers State Bank at Allen, Oklahoma (Allen *215 bank). Before acquiring an interest in the Marlow, Verden, and Allen banks, petitioner was president and chief officer of the First National Bank of Chickasha, in Chickasha, Oklahoma. Petitioner devoted approximately half of his time to his own personal loan business in Chickasha and divided the remainder of his time between the banks at Marlow, Verden, and Allen. The minutes of the board of directors of the Marlow Bank on May 27, 1970 contain the following: With further reference to the matter of Chairman, W. M. Acree, paying off or purchasing notes from the bank, this was discussed thoroughly and in detail. The Board is very pleased to have Mr. Acree purchase any note from the bank at net cost to the bank that he feels has turned sour or would be a loss to the bank. Therefore, upon motion duly made and seconded, the Board voted unanimously to approve Mr. Acree's action in this connection not only to just purchase notes covered by repossessed cars, but any note that he feels would be a loss or collection of same doubtful. This applies to all past and future purchases of notes. Petitioner currently operates a personal loan business in Chickasha, Oklahoma. Petitioner has *216 not been compensated for any of his losses by insurance or otherwise. Facts re Hooper, Woods, and Rebel Loans Hooper Loan
Jessie Hooper (Jessie) and petitioner have been good friends for approximately 20 years. In 1962 Jessie began to do domestic work for petitioner. She continued this work intermittently through 1972. Beginning in January 1967 and ending on December 23, 1967, petitioner made payments to or for the benefit of Jessie in the amount of $1,209.23. Jessie was paid separately from these payments for her work. No collateral secured the payments and no note evidencing the indebtedness was executed. Furthermore, no agreement was reached regarding an interest rate, no repayment schedule was established, and no time of repayment specified. However, these payments were carried as loans on the books of petitioner's loan business in Chickasha as an account receivable. In 1967 Jessie was only able to work part time due to her periodic confinements in a hospital. Her husband, Verles, became unable to work in December 1968 due to heart trouble that began to impair his ability to work during 1968.During 1967 the combined income of the Hoopers was not sufficient *217 for them to pay their medical bills, utility bills and household payments. Nevertheless, the Hoopers intended to repay the advances. [5]
Woods Loan
Petitioner had previously transacted business with Oneva Woods. Petitioner loaned Woods $475 on October 30, 1967. No note was executed but petitioner carried the loan on the books in his Chickasha loan office as an account receivable. Mrs. Woods left the state shortly after receiving the loan, and petitioner has been unable to collect any amount of the loan. Rebel Loan
Petitioner made a personal loan of $4,550.37 to the Rebel Installation Company (Rebel), in connection with a steel erection venture. The loan was in three increments beginning in November 1967 and ending in February 1968. Although the lenders did not honor their commitment to execute a note, they received the proceeds of the loan and the loan was carried by petitioner as an account receivable. During 1968, the owners of the company abandoned their venture and left the Marlow area, taking equipment with them subject to a chattel mortgage to secure a bank loan independent from petitioner's *218 personal loan. Petitioner was unable to collect any of the balance remaining on the loan. Opinion re Hooper, Woods, and Rebel Loans
Section 166 provides a deduction for debts which become worthless during the taxable year. The deduction is predicated upon the existence of a valid and enforceable obligation to pay a fixed or determinable sum of money. Section 1.166-1(c), Income Tax Regs. Thus, our inquiry must first focus on whether or not a bona fide debt resulted from petitioner's advances to Hooper, Woods and Rebel. Petitioner and the Hoopers had been good friends for many years and Jessie Hooper was petitioner's employee for at least 5 years prior to the advances in issue. Petitioner advanced funds as needed or made payments directly to the Hoopers' creditors on an adhoc basis. The absence of the ordinary characteristics of a loan, the manner in which the funds were made available to the Hoopers, and the personal relationship which existed between petitioner and the Hoopers all militate against the conclusion that the advances were loans. *219 Moreover, it is difficult to believe that petitioner thought of the advances as loans and expected repayment when he made the last advance to the Hoopers. That payment was made just 8 days before he contends that all of the Hooper advances became worthless and was made after numerous advances and virtually no repayment during the course of the year. Since no bona fide debt was created by the advances to the Hoopers, petitioner is not entitled to deduct any of those amounts under section 166. The Woods and Rebel advances, on the other hand, did result in enforceable obligations, and as noted were carried as loans on the books of petitioner's personal loan business. Petitioner had neither the intention nor the incentive to make a gift to Woods or a capital contribution to Rebel. In contrast, to the adhoc payments made to or for the Hoopers, the Woods and Rebel loans consisted of a lump sum and several large installments, respectively. Furthermore, the Woods and Rebel loans originated in petitioner's personal loan business and were unquestionably business debts. Section 1.166-5(b)(2), Income Tax Regs. Having concluded that the advances to *220 Woods and Rebel constituted bona fide business debts, we must now determine whether these debts became worthless in the years deducted. All of the facts and circumstances must be considered to determine whether or not the debts became worthless in the year deducted. Section 1.166-2(a), Income Tax Regs. Generally, a debt is considered worthless in the year in which identifiable events clearly indicate the futility of any hope of recovery. Denver & Rio Grande Western Railroad Co. v. Commissioner,279 F. 2d 368 (10th Cir., 1960); James A. Messer Co.,57 T.C. 848 (1972). Neither debtor repaid any amount of the loans and both debtors disappeared from the state during the year in which the debts allegedly became worthless. The owners of Rebel had, in addition, abandoned their business and taken with them equipment which secured a loan obtained from a source other than petitioner. All of these circumstances convince us that on the particular facts before us, the Woods loan became worthless in 1967 and the Rebel loan in 1968. Consequently, *221 petitioner is entitled to a deduction under section 166 for these debts. Facts re Bank Loans (Foster, Orange, Bunny Kinslow, Benson, and Glen Kinslow)
Foster Loan
Fredda Foster was a school teacher in Guthrie, Oklahoma and had been a customer of petitioner for many years. The Foster loan in issue originated as a personal loan by petitioner to Fredda Foster. Petitioner subsequently refinanced the Foster note with The First National Bank at Marlow. Either pursuant to this refinancing or by renewal of the refinanced note, the Marlow bank made a loan of $2,838.60 to Fredda Foster on February 8, 1967. The note was secured by china, silverware, and other valuable personal property which had belonged to Mrs. Foster and was located in the basement of The First National Bank of Chickasha. Subsequently, Mrs. Foster Became delinquent in making payments on the note. After petitioner had made demand on her to pay the loan and in the summer of 1967, Mrs. Foster wrote petitioner requesting that he check on the collateral securing her obligation. Petitioner began a search for the collateral in September 1967 and was unable to locate the security. People had been going in and *222 out of the basement as the bank had been remodeled and in the process the security had disappeared. Petitioner made payment on the Foster loan of $100 on August 16, 1967 and $1,581.73 on October 11, 1967. The Marlow bank assigned the Foster note to petitioner on October 11, 1967, and he undertook collection of the debt. Fredda Foster advised petitioner that she had been in a bad accident, broken both of her knees, had been in a nursing home in California for a long period of time, had exhausted all of her surplus money, and was unable to work. Her sole source of income was her schoolteacher's pension which was entirely consumed by living expenses, medical expenses, and payments to the nursing home, and the only source of funds to honor the debt was a suit against the bank at Chickasha for losing the collateral. Mrs. Foster returned from California and employed attorneys Orval Viers and Dick Jones to sue The First National Bank of Chickasha. The suit against the bank was filed in the Federal District Court for the Western District of Oklahoma in Oklahoma City in June of 1969. Mrs. Foster was unable to establish the $10,000 jurisdictional amount and the suit was dismissed *223 without prejudice in September of 1969. Orange Loan
Louis Orange was a resident of Chickasha and had done business in Chickasha with petitioner for many years. In 1965 petitioner sold an automobile to Orange, the purchase of which was financed through the Marlow bank. On July 5, 1967, when the balance on the note was $1,081.83, Orange refinanced the note with the Marlow bank with the car serving as security for the refinanced note. The loan was criticized by the bank examiner, the criticism being based, at least in part, on the obligor's residence being outside the banking area. Mr. Orange's son took the car without permission and was involved in a collision in which the vehicle was destroyed. Since it was taken without permission, the insurance company refused to pay anything on the car. On September 21, 1967, a date subsequent to the accident, petitioner paid $855.46 on the note; the note was then assigned to him, and he undertook collection. Mr. Orange was advanced in years, his income was limited, he was unable to support his family and pay on the loan, and his only asset was his home. Bunny Kinslow Loan
Petitioner knew Bunny Sue Kinslow all his life and *224 had done business with her in Chickasha through his personal loan business and at the bank in Chickasha. Petitioner sold Kinslow a repossessed car which he owned. The purchase was financed through the Marlow bank but the note was assigned to the Allen bank during 1968. The automobile served as security for the loan. When the loan became delinquent, the car was repossessed and sold and the proceeds were applied to the loan. On December 5, 1968, petitioner paid the balance of $525.17 on the note which was assigned to the petitioner. Petitioner has been unable to collect the amount due, Bunny Kinslow having married and departed the state. Benson Loan
Ella Benson and her husband had borrowed money for a number of years from petitioner's personal loan business in Chickasha and from the The First National Bank in Chickasha of which he was president. In 1968, Mrs. Benson and her son, Mr. Bodie Benson, came to the Marlow bank to obtain a loan for the purpose of establishing the son in the precast concrete business. A note signed by Mrs. Benson and her son was given to the bank on October 5, 1968. The loan was made to the Bensons in their personal capacity. The Benson note *225 was due on November 5, 1968. On December 26, 1968, the balance outstanding was $4,624.40. On that date petitioner paid the Marlow bank the balance, was assigned the note and undertook collection of the obligation. Petitioner repossessed the automobile which served as security for the loan and sold it for $3,337.40, which he applied to the note leaving a balance of $1,287. Bodie Benson's business failed and he left the state in 1968. Mrs. Benson also left the state in 1968 without assets. To date petitioner has been unable to collect any amount due on the note. Glen Kinslow Loan
Petitioner has made loans to the Kinslow family for many years through his personal loan business in Chickasha. Petitioner made a loan to Glen Kinslow which was later refinanced through the Allen bank. When Kinslow wished to increase the size of the loan, the loan was was transferred to the Marlow bank. On April 29, 1968, the Marlow bank made a loan of $31,500 to Kinslow and his wife. Although the loan was made to Kinslow in his personal capacity, the proceeds of the loan were used to purchase machinery and equipment which served as collateral for the loan. In November 1968 the Marlow *226 bank filed a suit to foreclose its interest in the collateral pledged as security on the Kinslow loan. On December 30, 1968 petitioner made a payment of $10,000 on the loan. The Marlow bank subsequently recovered some of the collateral, sold it and applied the proceeds to the loan. In 1969 petitioner paid the remaining balance and the note was assigned to him. Petitioner obtained a judgment on the note in 1969 but the execution was returned unsatisfied sometime thereafter. Petitioner has been unable to recoup the $10,000 payment. Opinion re Bank Loans (Foster, Orange, Bunny Kinslow, Benson, and Glen Kinslow)
Petitioner contends that the remaining loans, although ostensibly made by the Marlow or Allen bank, were in fact his loans [6] and that he therefore personally guaranteed each of the loans. Consequently, he claims a business bad debt deduction under section 166. Alternatively, petitioner contends that the loss on the loans is deductible either under section 165 as a business loss or under section 162 as an ordinary and necessary business expense. We are not persuaded by any of petitioner's arguments. *227 The loans here in issue were all bank loans. If these loans were, as petitioner contends, his loans, there is nothing in the record to indicate that the loans were so identified in the bank records. There was neither a segregation of the accounts nor any notation on the accounts to identify these loans as petitioner's. Moreover, the record does not support petitioner's assertion that since the obligors were individuals with whom he had previously transacted business and who resided outside the normal service area of the banks, petitioner orally guaranteed these loans.The minutes of the board of directors of the Marlow bank on May 27, 1970 contain the following: With further reference to the matter of Chairman, W. M. Acree, paying off or purchasing notes from the bank, this was discussed thoroughly and in detail. The Board is very pleased to have Mr. Acree purchase any note from the bank at net cost to the bank that he feels has turned sour or would be a loss to the bank. Therefore, upon motion duly made and seconded, the Board voted unanimously to approve Mr. Acree's action in this connection not only to just purchase notes covered by repossessed cars, but any note that *228 he feels would be a loss or collection of same doubtful. This applies to all past and future purchases of notes. This language indicates no more than a policy, exercisable in the discretion of petitioner on an adhoc basis, to assume certain notes which might otherwise result in a loss to the bank. To conclude that this passage, extracted from the minutes of a board meeting 2 years subsequent to petitioner's assumption of the loans here in issue, reflects either a contractual or moral obligation binding petitioner to assume the notes would require a strained interpretation. The board claimed to be "very pleased" with the adhoc policy, language hardly suggesting petitioner was discharging an obligation he was contractually bound to perform. The language from the minutes is indicative of the desire of a principal shareholder and major investor to protect the capital structure of the business rather than descriptive of specific contracts of guarantee. We note also that under Oklahoma law, contracts of guarantee must be in writing to be enforceable. Okla. Stat. Ann. tit. *229 15 § 136 (1972). Petitioner points out that under Oklahoma law, failure to comply with the statute of frauds only makes a contract voidable not void, providing the guarantor with a personal defense that may be waived. While this may be juridically correct, we nevertheless believe that the failure of the bank and its principal stockholder and principal officer, to structure the guarantee so that the bank was assured a legal remedy is, when considered with the other evidence in this case, some indication that no guarantee of the obligation in question was in fact made. Certainly, the bank would not, in a normal arms-length transaction, loan money where an important part of the security was an oral guarantee. [7]
Petitioner claims to have had a general policy through the *230 years of his affiliation with the banking business of personally guaranteeing bank loans. However, petitioner's very general comments failed to cover the details of these guarantees in a way convincing us that he had anything rising above an adhoc policy. In summary, we did not find petitioner's testimony, upon which his case is largely predicated, very convincing on this issue. Since these were not petitioner's loans and he did not guarantee these loans, he is not entitled to a deduction under section 166. Petitioner alternatively contends that the money expended in these transactions represents losses incurred in a trade or business entitling him to a deduction under section 165(c)(1). However, any loss petitioner sustained was in the acquisition of these obligations, since the loans did not decline in value after petitioner acquired them. All but the Benson loan were worthless when acquired, and in fact petitioner claims to have assumed the loans because they were bad. [8] The loss on the Benson note was the difference between the collateral and the remaining balance on the note, which petitioner knew at the time he acquired the Benson note. Petitioner paid *231 $10,000 in reference to the Kinslow note in 1968, but the bank retained the note and subsequently realized on the collateral. It was not until 1969, a year subsequent to the years before us, that petitioner took assignment of the Glen Kinslow note. The loans were made by the banks and if any losses were incurred, they were incurred by the banks. Petitioner could not by his payments transform these losses into his losses. Petitioner can argue, as he does, that the expense was incurred to protect his reputation as a businessman but not that he has incurred a loss on the acquisition and disposition of these loans. As noted, petitioner alternatively claims that the amounts were paid to protect his reputation as a lender and bank official and are, therefore, deductible *232 as ordinary and necessary business expenses under section 162. It is clear that payments on another's behalf are deductible by the taxpayer if they are made to protect the taxpayer's own business or business reputation. C. Doris H. Pepper,36 T.C. 886 (1961); Charles J. DiNardo,22 T.C. 430 (1954); Catholic News Publishing Co.,10 T.C. 73 (1948). Moreover, the payment need not be predicated on a legal liability and a voluntary payment if made to protect business reputation will qualify as an ordinary and necessary business expense. Samuel R. Milbank,51 T.C. 805 (1969). Petitioner has, however, failed to demonstrate that the payments in issue were related to the protection of either his business as a bank officer or as a lender. There is some indication that the notes were assumed because the bank was unable to take the loss itself and some indication that criticism by bank examiners of the original loan acquisition by the bank may have played a role. Additionally, petitioner may have regarded himself as legally or *233 morally responsible for the loans when they went bad. It may also be that petitioner felt his ability to transfer future loans from his own lending business to the banks he controlled would be impaired by requiring the banks to absorb the losses on these loans. Nevertheless, petitioner's actions in regard to the specific loans in question are only loosely tied to his own trade or business, either as a lender or a bank official. It is equally possible that his dominant motive was his desire to maintain the banks, in which he was majority shareholder and a major investor, on a sound business basis. It is axiomatic that the trade or business of the bank is not petitioner's trade or business. Whipple v. Commissioner,373 U.S. 193 (1963). Certainly the record does not convince us that petitioner's failure to purchase these debts (and other debts he may have purchased) would have jeopardized his position as a bank official or impaired his own loan business. It is not usually expected that a bank official must purchase bad debts to keep his job; the only factor in the record distinguishing petitioner from the usual bank official is that he was also the majority *234 shareholder. Similarly, there is no evidence governing how his failure to pick up these loans on an ad hoc basis would have adversely affected his own small personal loan business, which served a clientele and geographic area different from the one served by the banks. In summary, petitioner's very general, sometimes vague and conflicting testimony failed to convince us that his dominant motive was to preserve his business reputation. United States v. Generes,405 U.S. 93 (1972). Decision will be entered under Rule 155. Footnotes
1. The term "loan" is used to characterize the disputed transactions merely for convenience. It is not intended to indicate a legal conclusion. ↩
2. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
3. Louise Acree died on August 18, 1974. W. M. Acree will hereinafter be referred to as petitioner.↩
4. The amount of the deduction claimed by petitioner for the Benson loan was $1,250. The evidence indicates that the proper amount is $1,287.↩
5. The Hoopers did in fact repay $32.50 on June 23, 1967.↩
6. The Foster and Glen Kinslow loans did indeed originate in petitioner's personal loan business but were later refinanced by one of the banks.↩
7. Petitioner apparently realizes the problem, explaining that the banking laws would not permit him to guarantee the loans in writing. This seems to suggest that a contract of guarantee, at least if it is in writing, may be illegal and possibly void. See Restatement of Contracts, § 512↩ comment c (1932). The specific banking statutes which would prohibit a written guarantee by petitioner were not cited.
8. If petitioner were paying pursuant to a guarantee, he would be confined to section 166. Putnam v. Commissioner,352 U.S. 82 (1956). Here, the payment made voluntarily on an adhoc basis is either a contribution to capital or a deductible business expense under section 162, but by no rationale may the transaction be brought within the purview of section 165. Id↩ at 88.