T.C. Memo. 1995-522


UNITED STATES TAX COURT


DOUGLAS V. AND MAGDALENE MERANTE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17218-93.                    Filed November 1, 1995.


Douglas V. Merante, pro se.


<u>Allison Rodgers</u>, for respondent.


MEMORANDUM OPINION


NAMEROFF, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7443A(b)(3)[1] and Rules 180, 181, and 182.

---

[1] All section references are to the Internal Revenue Code in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioners' Federal income tax for 1990 in the amount of $5,090. The sole issue to be decided is whether petitioner is entitled to any deduction in connection with an alleged business bad debt of $32,722, which respondent disallowed in full. Respondent contends, alternatively, that the alleged debt was an investment or a nonbusiness bad debt, and, in any event, that it has not been shown to have become worthless in 1990.

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by reference. Petitioners resided in Murrieta, California, at the time of the filing of their petition.

Prior to 1988, Douglas V. Merante (hereinafter petitioner when used in the singular) was involved in corporate management. Petitioner had served as vice president of Superior Steel in New York. In addition, petitioner was an investor and president of a corporation entitled Koramics Inc. (Koramics), which specialized in importing high-quality, high-tech ceramic tile from Germany and Belgium. However, Koramics was unsuccessful and by 1987 became inactive. In 1988, petitioners relocated to California, and petitioner began looking for new business opportunities. Shortly thereafter, petitioner met Richard Sheldon (Sheldon) at a

Glen Ivy property and became interested in an operation called Time To Share.[2]

Glen Ivy Resorts (Glen Ivy) owned and operated extensive time-share resort properties in the United States. Sheldon operated a marketing company called Time To Share. The function of Time To Share was, through various incentive programs, to bring potential clients to visit sales locations of Glen Ivy, whereupon Glen Ivy's sales staff would attempt to sell time-share properties to prospective clients.

Sheldon apparently convinced petitioner that the Time To Share venture had good potential for profit, and petitioner became involved in the operation of Time To Share. Petitioner was not an employee of Time To Share and did not receive a salary, but he did oversee one of Time To Share's offices and exercised some management functions. Petitioner's description of

_____

[2] The public records of the State of California reflect that a fictitious business name statement was filed on Jan. 17, 1989, signed by Betty Sheldon, Sheldon's wife, providing that, as of Jan. 17, 1989, Time To Share was a fictitious name of Betty Sheldon and Jeff Arcuri, and that the business was conducted by a general partnership. On Feb. 27, 1989, a fictitious business name statement was filed reflecting that Time To Share as of Feb. 15, 1989, was a fictitious business name of Betty Sheldon and the business was being conducted by an individual. Subsequently, a public notice published on Jan. 8, 1990, and filed on Jan. 23, 1990, in a County Clerk's office, stated that a partnership of Jeffrey Arcuri, Richard Sheldon, and PRU Enterprises, doing business under the fictitious firm name of Time To Share, was dissolved on Dec. 1, 1989, and that said business in the future will be conducted by Richard Sheldon and PRU Enterprises. The record contains no information with regard to the identification or structure of PRU Enterprises.

his role with Time To Share in this regard was quite vague. The exact date of petitioner's commencement of activities with Time To Share was not set forth in the record.

On January 3, 1989, petitioner wrote a check to Sheldon for $2,500. The memo portion of the check states "Glitter Glaze TTS startup expenses". It is not exactly clear what was intended by the phrase Glitter Glaze TTS, although TTS may have referred to Time To Share, and Glitter Glaze may have had something to do with Koramics or some other paint enterprise.

Apparently, Time To Share developed cash flow problems and needed infusions of funds from time to time to maintain its operating expenses. Sheldon prevailed upon petitioner to assist with this problem, and it appears petitioner was the sole source of assistance. On February 6, 1989, and March 23, 1989, petitioner wrote two checks payable to Sheldon, each in the amount of $5,000. The memo portion of these checks contains the phrases "for partnership for Time To Share" and "general partnership in Time To Share", respectively. No notes or other documents of indebtedness were signed by Sheldon with regard to these transactions at this time.

On April 2, 1989, and again on April 7, 1989, petitioner gave $2,500 cash to Sheldon. On April 2, 1989, Sheldon signed a document that states:

> Time To Share hereby acknowledges this 2nd day of April 1989 receipt of $2,500 cash from Douglas Merante as a loan to the company (Time To Share).

Sheldon signed the document as president of Time To Share. On April 7, 1989, Sheldon signed a document stating:

> I hereby acknowledge on behalf of Time To Share receipt of $2,500 cash from Douglas Merante as a loan to Time To Share.

On April 11, 1989, petitioner wrote a check payable to Sheldon for $5,000, with a memo note "Time To Share gen. partnership"; and on April 29, 1989, petitioner wrote a check to Sheldon for $2,000, with a memo note "Time To Share". As of April 29, 1989, including the January 3, 1989, Glitter Glaze check, petitioner had transferred $24,500 to Sheldon.

On April 29, 1989, a document entitled "Agreement" was signed by petitioner and Sheldon that purported to form a general partnership between petitioner and Sheldon

> for the purpose of engaging in various businesses including but not limited to: Time To Share * * * and the Merante Group Ltd., a California Corporation (through which the parties hereto intend to promote and find licensees for the manufacture of Plekodur Solid Paint and other specialty paints, coatings and possibly other products currently manufactured by * * * a West German firm with whom the Merante Group Ltd. has a special relationship.

The partnership agreement also provides that the parties thereto are to have equal ownership in each of the United States entities; i.e., Time To Share and the Merante Group Ltd.[3] The

---

[3] The record contains no information with regard to an entity entitled the Merante Group Ltd. Glitter Glaze TTS may
(continued...)

partnership agreement made no provision with regard to capital contributions to the partnership, nor any reference to the advances made by petitioner to Sheldon prior to the date of the document.  Nevertheless, Sheldon and petitioner signed a document entitled "Cancellation of General Partnership Agreement and Partnership Agreement" as of April 30, 1989.

On January 30, 1990, petitioner transferred a car to Sheldon in return for a check in the amount of $2,900.  In the memorandum portion of the check is written "Time To Share repayment on loan."  The check was returned for insufficient funds, and Sheldon has never made good on the check, nor has he returned the car.

On June 18, 1990, petitioner purchased an "official check" in the amount of $2,500 payable to Sheldon.  On that date, Sheldon and Merante signed a document entitled "AGREEMENT" which provided:

> In return for a loan this day by [petitioner] to [Sheldon] of $2,500 and for other loans which together with the herein referred to load [sic] total $27,000, [Sheldon] promises to repay the entire total of $27,000 to [petitioner] no later than Wednesday, June 27, 1990.

On July 25, 1990, petitioner gave Sheldon cash of $1,068.

On October 9, 1990, Sheldon signed a document entitled "PROMISSORY DEMAND NOTE" in which he agreed to repay a loan to

petitioner in the amount of $2,869, which was given to Sheldon "in the form of N.S.A. water filters, literature and sales aids". Sheldon promised to pay said amount no later than October 15, 1990.  Petitioner stated that he had purchased the water filter units for resale; however he transferred these units, plus affiliated paraphernalia, to Sheldon.  The record does not reflect petitioner's cost of the transferred assets.

On October 19, 1990, a document entitled "PROMISSORY DEMAND NOTE" was signed by Sheldon as president of Time To Share.  In this document, Time To Share acknowledged an indebtedness to petitioner in the amount of $32,722, which consisted of:  (1) The June 18, 1990, note of $27,000; (2) the October 9, 1990, note of $2,869; (3) the order for NSA materials of $1,785; and (4) the cash loaned July 25, 1990, in the amount of $1,068.  The promissory demand note further provided:

> This note is due and payable on November 1, 1990, and no notice whatsoever, either oral or written shall be required on the part of Douglas V. Merante and Magdalene Merante. Interest shall be calculated from the date of each respective loan as listed herein at a rate of 10 percent per annum.[4]  Demand shall be deemed made for the full amount on November 1, 1990.
>
> TIME TO SHARE HEREBY WAIVES any and all recourse regarding the indebtedness listed herein and ACKNOWLEDGES THAT ALL MONIES LISTED HEREIN ARE OWED TO DOUGLAS V. MERANTE AND MAGDALENE MERANTE AS JUST BUSINESS DEBTS.

---

[4]    This is the first point in time that any mention of interest appears.

Subsequently, Sheldon became difficult to contact. He avoided telephone calls from petitioner and apparently moved from the Orange County area to San Luis Obispo. Time To Share was virtually out of business, and, allegedly, Glen Ivy was having difficulties itself, while owing Time To Share a substantial sum of money. Sometime in 1991 or 1992, Glen Ivy filed for bankruptcy.

Petitioner received a letter dated December 15, 1990, signed by Sheldon as president of Time To Share, stating that Time To Share was unable to pay the $32,722. The letter provides, in part:

> Your many inquiries regarding the payment of the note signed by Time To Share dated October 19, 1990, have made it necessary for me to contact you at this time to let you know that we have no monies with which to fulfill this obligation to you and Maggie.

> I am truly sorry for this situation and realize that this is a great deal of money for you to lose but we simply do not have the funds to make even a small payment possible. The way it appears now, we will probably have to close the company and the loans that you have made to Time To Share will not be repaid.

As of the end of 1990, Sheldon had no assets and was insolvent.

Full deductibility from ordinary income is allowed for the worthlessness of business bad debts, whereas worthless nonbusiness bad debts are accorded short term capital loss treatment. Sec. 166(a) and (d). We find that petitioner's advances to Sheldon were nonbusiness debts. We do not agree with

respondent's contention that the transactions were investments rather than bona fide loans. Suffice it to say that the weight of the evidence supports the finding that petitioner and Sheldon intended a debtor-creditor relationship, rather than an equity relationship.

In order to qualify as a business bad debt, the debt must have been created or acquired in connection with a trade or business of the taxpayer (section 166(d)(2)(A)), or the loss must have been incurred in petitioner's trade or business (section 166(d)(2)(B)). Petitioner must demonstrate that the loss resulting from the worthlessness of the debt bears a "proximate relationship" to a trade or business in which he was engaged. This is a question of fact. Sec. 1.166-5(b), Income Tax Regs. The test for determining whether a particular debt bears a "proximate relationship" to the taxpayer's trade or business was set forth by the Supreme Court as follows:

> in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * * [United States v. Generes, 405 U.S. 93, 103 (1972)].

If the interest of the lender is predominantly that of an investor, the debt will be characterized as a nonbusiness bad debt, because management of one's own investments, no matter how

extensive, does not constitute a trade or business.  Higgins v. Commissioner, 312 U.S. 212, 218 (1941).

In the instant case, it is unclear whether petitioner was engaged in any trade or business in 1989 and 1990.  He was involved in the activities of Time To Share, but the extent of those activities is uncertain.  He received no remuneration whatsoever for his efforts, and we cannot even classify him as an employee.  Petitioner does not contend, nor does the record support a finding, that petitioner was in the business of making loans.  Accordingly, to the extent that the advances are proven worthless in 1990, we hold that the debts were nonbusiness bad debts, deductible as short-term capital losses.[5]

A bad debt is deductible only in the year it becomes worthless.  Denver & R. G. W. R. Co. v. Commissioner, 32 T.C. 43, 56 (1959), affd. 279 F.2d 368 (10th Cir. 1960); Feinstein v. Commissioner, 24 T.C. 656, 658 (1955).  Petitioner has the burden of proving that the debt became worthless during the year in question.  Rule 142(a); Estate of Mann v. United States, 731 F.2d 267, 275 (5th Cir. 1984); James A. Messer Co. v. Commissioner, 57

---

[5]     The $2,900 check of Jan. 30, 1990, is not a true loan or advance.  It was payment for the sale of a car.  The record is insufficient to allow any deduction on that account.  Moreover, the amount of loss with regard to the Oct. 9, 1990, promissory note for $2,869 given for transfer of water filters, etc., depends upon petitioner's basis in the transferred assets, which has not been established herein.  Consequently, no part of the $2,869 is deductible herein.

T.C. 848, 861 (1972).  When or whether a debt became worthless is a question of fact, the answer to which lies in an examination of all the circumstances.  Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Estate of Mann v. United States, supra at 275; Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950).  The taxpayer must show some identifiable event which proves worthlessness in the year claimed.  United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 401 (1927); Dallmeyer v. Commissioner, supra at 1291-1292.  There is no standard test or formula for determining worthlessness within a given taxable year; the determination depends upon the particular facts and circumstances of the case.  Lucas v. American Code Co., 280 U.S. 445, 449 (1930); Crown v. Commissioner, 77 T.C. 582, 598 (1981); Dallmeyer v. Commissioner, supra at 1291.

On balance, we believe that petitioner's ability to recover anything from Time To Share or Sheldon became fully worthless in December 1990.  Time To Share's business was gone, as were its assets.  Indeed, the constant need of Sheldon to borrow funds and his submission of a worthless check were strong clues that petitioner would not get his money back.  Sheldon's letter and disappearance in December of 1990 solidified the view that nothing would be recovered.  Moreover, Sheldon confirmed this by testifying credibly that he was insolvent at the end of 1990.

Respondent contends that the advances were not worthless because Sheldon admitted that Time To Share had a receivable from Glen Ivy of a substantial amount at the end of 1990. We do not believe this allegation is significant in that Time To Share was having difficulty collecting from Glen Ivy for some time, indicating that Glen Ivy was probably in dire financial straits, as further evidenced by its filing for bankruptcy in 1991 or 1992. Moreover, petitioner would have had to obtain a judgment against Sheldon and/or Time To Share first and then proceed against Glen Ivy (probably along with numerous other creditors) at a prohibitive cost. This type of effort is not required to establish worthlessness. Accordingly, we hold that petitioners are entitled to a short term capital loss deduction of $3,000 on their 1990 return.

<u>Decision will be entered under Rule 155</u>.