SOUTHERN PACIFIC TRANSPORTATION COMPANY, TRANSFEREE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7501-72, 7502-72, 8646-72—8648-72.          Filed April 21, 1988.

*William E. Saul, Claude F. Kolm, Brian J. McKenna,* and *Arnold I. Weber,* for the petitioners.
*William E. Bonano* and *Rebecca T. Hill,* for the respondent.

JACOBS, *Judge*: Notices of income tax deficiencies and transferee liabilities for these consolidated cases concern the years 1962 through 1968.[2] The deficiencies, as determined by respondent, are as follows:

---

[1]Cases of the following petitioners are consolidated herewith: Southern Pacific Company, formerly S.P., Inc., docket Nos. 7502-72 and 8648-72; Southern Pacific Transportation Company, Transferee, docket Nos. 8646-72 and 8647-72.

[2]Notices of deficiencies were sent to Southern Pacific Transportation Co. in its capacity as transferee of the assets of the former Southern Pacific Co., the common parent of an affiliated group of corporations.

| Year | Amount[3] |
|------|-----------|
| 1962 | $14,087,392 |
| 1963 | 10,718,321 |
| 1964 | 11,446,017 |
| 1965 | 8,827,875 |
| 1966 | 8,972,806 |
| 1967 | 10,590,947 |
| 1968 | 21,499,083 |

Petitioners claim overassessments and overpayments of tax for these years in excess of $100 million.

The parties have settled, or have informed the Court that they will be able to settle, all but 5 of the more than 150 issues in this case. One of the unsettled issues is whether the notices of deficiency issued to new Southern Pacific are invalid because it is not a proper agent for receipt of notices of deficiency for the consolidated group for the years 1962 through 1968. A second related issue is whether Southern Pacific Transportation Co. is liable as a transferee. The third related issue is whether the statute of limitations bars all assessments for taxable years 1962 through 1967. Based on the Court's prior opinions which held that Southern Pacific Co. was a proper agent for years prior to 1969 (*Southern Pacific Co. (formerly S.P. Inc.) v. Commissioner*, 84 T.C. 375, 387 (1985), and *Southern Pacific Co. (formerly S.P. Inc.) v. Commissioner*, 84 T.C. 395, 404-405 (1985)), the parties did not further brief herein the first three issues. Instead, they supplemented the record with a stipulation and attached exhibits, and reserved the right to submit additional evidence on the statute of limitations and notice of deficiency issues should the Court's holdings in its prior opinions be reversed on appeal.

The two issues remaining for resolution at this time are: (1) Whether amounts paid to support or oppose various State and local propositions are deductible (herein referred to as the initiatives issue), and (2) whether amounts paid in connection with the construction of public highway overpasses over petitioners' tracks and roadbeds qualify for the investment tax credit (herein referred to as the overpass issue).

After concessions, the amount of deductions involved with respect to the initiatives issue are as follows:

[3]All amounts are rounded to the nearest dollar.

| Year | Amount |
|------|--------|
| 1964 | $1,243,825 |
| 1966 | 8,500 |
| 1967 | 7,000 |
| 1968 | 41,925 |

After concessions, the amount of the deductions and tax credits involved with respect to the overpass issue are as follows:

| Year | Amount of deduction | ITC |
|------|---------------------|-----|
| 1962 | $57,882 | $4,052 |
| 1963 | 166,136 | 11,630 |
| 1964 | 608,536 | 42,598 |
| 1965 | 593,461 | 41,542 |
| 1966 | 461,775 | 32,324 |
| 1967 | 2,613,254 | 182,927 |
| 1968 | 388,938 | 27,226 |

The facts relating to the initiatives issue have been fully stipulated and are so found. Some of the facts relating to the overpass issue have been stipulated and are so found.

### GENERAL FINDINGS OF FACT

On November 26, 1969, former Southern Pacific Co. merged with Southern Pacific Transportation Co. (Transportation). Transportation was the surviving corporation in that merger. Former Southern Pacific Co. was a corporation organized under the laws of Delaware on March 21, 1947. It was engaged in the business of furnishing railroad transportation services in the State of California and various other States west of the Mississippi River. Transportation was incorporated under Delaware law on February 20, 1969. Sometime before November 26, 1969, S.P., Inc., a newly formed Delaware corporation, acquired the outstanding stock of Transportation pursuant to the terms of a merger agreement, dated February 20, 1969, among former Southern Pacific, Transportation, and S.P., Inc. In accordance with the merger agreement, former Southern Pacific transferred all of its assets to Transportation and ceased its separate corporate existence. S.P., Inc., subsequently changed its name to Southern Pacific Co. (new Southern Pacific), and the stock of the shareholders of former Southern Pacific was automatically converted into stock of

new Southern Pacific. As of November 26, 1969, new Southern Pacific owned all the stock of Transportation which, in turn, owned all the assets of former Southern Pacific. Hereinafter, we shall refer to both former Southern Pacific Co. and new Southern Pacific as Southern Pacific. The principal place of business of Southern Pacific and Transportation at the time the petitions in these cases were filed was San Francisco, California.

For convenience, our remaining findings of fact and opinion will be grouped according to the issue involved.

## 1. Initiatives Issue

### FINDINGS OF FACT

Between 1962 and 1968, Southern Pacific and Northwestern Pacific Railroad Co., a wholly owned subsidiary of Southern Pacific, paid amounts to support or oppose a number of California State and local propositions. The recipients, purpose of the proposition, and amounts paid are as follows:

| Year | Recipient and purpose of proposition | Amount |
|------|--------------------------------------|--------|
| 1964 | Whitaker & Baxter Advertising Agency[4] (California Proposition 17, a proposal to allow freight trains to be operated in California with smaller crews than had previously been allowed, i.e., anti-featherbedding) | $1,205,974 |
| | Miscellaneous (California Proposition 17) | 1,574 |
| | Citizens Committee for Passage of Proposition D (San Francisco Proposition D, a proposal for issuance of bonded indebtedness for park and recreational facilities) | 1,000 |
| 1966 | Yes on Proposition 3 (California Proposition 3, a proposal to maintain and preserve open space land and to require state property tax assessors to take into account such restrictions in determining the value of such land) | 1,500 |

---

[4]Whitaker & Baxter Advertising Agency is a public relations firm hired by Southern Pacific and other railroad companies to manage the campaign for the adoption of California Proposition 17.

| Year | Recipient and purpose of proposition | Amount |
|---|---|---|
| | San Francisco International Airport Board Committee (San Francisco Proposition A, a proposal for bonded indebtedness for the acquisition, construction, and completion of transportation facilities, including airport facilities) | $7,000 |
| 1967 | San Francisco International Airport Board Committee (San Francisco Proposition A) | 7,000 |
| 1968 | Californians Against Proposition 9 (Proposition 9, a proposed constitutional amendment limiting property taxes) | 29,425 |
| | Committee for Propositions B & C (San Francisco Propositions B & C: Proposition B sought voter approval for the transfer of harbor facilities to the City and County of San Francisco and the assumption of related indebtedness under conditions enacted by the California State Legislature; Proposition C was a proposal to amend the San Francisco City and County Charter concerning control of the harbor by the City and County of San Francisco) | 7,500 |
| | Tax Slush Committee (City of Oakland Proposition J, a proposal to adopt a new charter for the City of Oakland) | 5,000 |

In addition, in 1964, Southern Pacific paid $35,277 to the Arizona Railroad Association, an organization of which it was a member, in order to qualify Proposition 200, an anti-featherbedding proposal, for the Arizona ballot.

Petitioners claimed deductions with respect to these ballot proposition expenditures; such deductions were disallowed by respondent.

The expenditures in question (except for amounts paid to the Whitaker & Baxter Advertising Agency) were paid to taxpayers' associations or local committees which were formed solely to campaign for or against the propositions. The local committees primarily consisted of local business entities, including Southern Pacific. The State taxpayers' associations and local committees engaged in radio, television, and newspaper advertising, as well as direct mail distributions.

Southern Pacific had a direct interest in the outcome of the propositions it supported or opposed, as follows:

(1) Passage of California Proposition 17 would mean that Southern Pacific and Northwestern Pacific Railroad Co. would be able to operate freight trains in California with crews smaller than had previously been required.

(2) Passage of San Francisco Proposition D (to finance improvements to parks and recreational facilities in San Francisco) would make San Francisco more attractive to prospective employees. Southern Pacific's headquarters were in San Francisco and some of its employees lived there.

(3) Passage of California Proposition 3 would affect the method of tax assessment of land used for growing food and of timberlands. Petitioners owned land in California that was used for growing food, as well as timberland, and it annually paid property taxes on such land.

(4) Passage of San Francisco Proposition A would provide funds for improved facilities at San Francisco International Airport, which would enable petitioners' employees to travel more quickly and efficiently to and from other cities.

(5) Passage of California Proposition 9 would have limited property taxes, and it was believed that this would raise other taxes in California. Petitioners were subject to State and local taxes in California other than, and in addition to, property taxes. Thus, passage of Proposition 9 might have increased the amount of taxes paid by petitioners.

(6) Passage of California Propositions B & C would revitalize San Francisco harbor. Businesses often shipped freight by Southern Pacific which arrived at, or was shipped from, the port of San Francisco. Alternative ports of arrival or embarcation for this freight might have meant transportation by railroads or carriers other than Southern Pacific.

(7) Proposition J was a proposal to adopt a new charter for the City of Oakland. Southern Pacific had a rail yard in, and lines that went through, Oakland; it owned property in, and paid taxes to, Oakland. It was believed that passage of Proposition J would result in a more efficient city government, thereby easing fiscal pressures on the city and resulting in a tax decrease (or a deceleration of the rate of tax increase) for Oakland taxpayers.

(8) Passage of Arizona Proposition 200 would mean that Southern Pacific would be able to operate freight trains in

Arizona with crews smaller than had previously been required.

All of the local propositions supported or approved by petitioners, except proposition B, were approved by the local boards of supervisors or city councils before submission to the voters for approval. Proposition B was submitted to the voters pursuant to a special statutory directive passed by the California State Assembly.

All of the State ballot propositions proposed constitutional amendments. All but one of these propositions, California Proposition 3, were placed on the ballot by the initiative process.[5] California Proposition 3 was placed on the ballot by the California State legislature. The local propositions were of three types: (1) Propositions to approve the adoption of, or amendment to, city or county charters (e.g., San Francisco Proposition C and Oakland Proposition J); (2) propositions to approve the issuance of bonded indebtedness (e.g., San Francisco Propositions A and D); and (3) a proposition to approve the transfer of local harbor facilities and related liabilities from the State of California to the city and county of San Francisco (e.g., San Francisco Proposition B).

The purpose of all of the various propositions involved herein was to change or amend California or Arizona State or local statutes, constitutions, or charters. In order for each of these propositions to pass, approval by at least a majority of the voters was required.

## OPINION

Petitioners claim entitlement under section 162(e) to deductions for expenditures made in connection with the State and local ballot propositions involved herein. Respondent disagrees; we agree with respondent.

In 1962, Congress enacted section 162(e), modifying then-existing Treasury regulations which had denied a business expense deduction for lobbying expenses and for expenditures related to the promotion or defeat of legisla-

---

[5]An initiative "is the power of the electors to propose statutes and amendments to the [State] Constitution and to adopt or reject them." Cal. Const. art. 2, sec. 8. See also Ariz. Const. art. 4, part 1, sec. 2 and art. 22, sec. 4.

A referendum "is the power of the electors to approve or reject statutes or parts of statutes." Cal. Const. art. 2, sec. 9. See also Ariz. Const. art. 4, pt. 1, sec. 3.

tion. The stimulus for the enactment of section 162(e) was the Supreme Court's decision in *Cammarano v. United States*, 358 U.S. 498 (1959),[6] which upheld the validity of the regulations (and thus denied a business expense deduction for funds contributed to finance a Statewide publicity program urging the defeat of an initiative), even though the expenditures in question were essential to the survival of the taxpayer's business.[7]

Section 162(e), effective for taxable years beginning after December 31, 1962, provides, in relevant part, as follows:

SEC. 162(e). APPEARANCES ETC., WITH RESPECT TO LEGISLATION.—

(1) IN GENERAL.—The deduction allowed by subsection (a) shall include all the ordinary and necessary expenses (including, but not limited to, traveling expenses described in subsection (a)(2) and the cost of preparing testimony) paid or incurred during the taxable year in carrying on any trade or business—

(A) in direct connection with appearances before, submission of statements to, or sending communications to, the committees, or individual members, of Congress or of any legislative body of a State, a possession of the United States, or a political subdivision of any of the foregoing with respect to legislation or proposed legislation of direct interest to the taxpayer,

\* \* \* \* \* \* \*

(2) LIMITATION.—The provisions of paragraph (1) shall not be construed as allowing the deduction of any amount paid or incurred (whether by way of contribution, gift or otherwise)—

\* \* \* \* \* \* \*

(B) in connection with any attempt to influence the general public, or segments thereof, with respect to legislative matters, elections, or referendums.

Section 162(e) originated as section 3 of H.R. 10650 (which became the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960). A reading of the House and Senate floor debates with respect to section 3, H.R. 10650, indicates that Congress did not wish to allow a deduction for business expenditures incident to grass root lobbying—i.e., expendi-

---

[6] *F. Strauss & Sons, Inc., of Arkansas v. Commissioner of Internal Revenue* was a companion case to *Cammarano*.

[7] No specific statutory provision existed for denying a deduction for this type of business expense. In upholding the validity of the Treasury regulations, the Supreme Court noted that the regulations had been in force for more than 40 years, stating that the congressional reenactment of the underlying statute in 1954 was "significant as indicating satisfaction with the interpretation consistently given the statute by the Regulations here at issue and in demonstrating its prior intent." *Cammarano v. United States*, 358 U.S. 498, 510.

tures made to influence the general public. Congress felt that the entire brunt of grass root lobbying expenditures should be borne by the businesses themselves, rather than permitting a significant proportion of such costs to be shifted to the Federal Treasury via tax deductions.

Petitioners argue that section 162(e) was enacted to overturn the Supreme Court's decision in *Cammarano* and that their position herein is identical to that of the taxpayers in *Cammarano*.[8] We agree that there is no discernible difference between petitioners' situation herein and that of the taxpayers in *Cammarano*. However, we do not agree that Congress intended to overturn *Cammarano* and to allow a business expense deduction for contributions to support or defeat an initiative.

Following the *Cammarano* decision, the Treasury Department promulgated new regulations relating to lobbying expenses, which have subsequently been repealed. These regulations (formerly section 1.162-15(c), Income Tax Regs.) denied a deduction for expenditures made to promote or defeat legislation. Such expenditures included amounts paid for the purpose of attempting "to influence members of a legislative body directly or indirectly by urging or encouraging the public to contact such members for the purpose of proposing, supporting, or opposing legislation." T.D. 6435, 1960-1 C.B. 79. Congress felt that the regulations "brought to a head many administrative and enforcement problems and uncertainties which have plagued both the Government and taxpayers." House Ways and Means Comm. Rept. to Sec. 3, H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 421. Accordingly, Congress enacted section 162(e) in an attempt to rectify these perceived problems. The

---

[8] *Cammarano* (and the companion case of *Strauss*) involved the following two situations:

In the first situation, the taxpayers jointly owned an interest in a partnership engaged in the distribution of beer at wholesale in the State of Washington. The partnership contributed money to a trust fund established by the Washington Beer Wholesalers Association in order to defeat an initiative which would have placed the retail sale of wine and beer in Washington exclusively in the hands of the State. The taxpayers claimed a deduction for their share of the partnership's contribution; such deduction was disallowed by the Commissioner.

The second situation involved a corporation engaged in the wholesale liquor business in Arkansas. The corporation, together with other Arkansas liquor wholesalers, organized and contributed money to an association in an attempt to defeat an initiative calling for a vote on statewide prohibition. The Commissioner denied the corporation a deduction for its contribution to the association.

In both situations, the Supreme Court held for the Commissioner.

underlying policy reasons for section 162(e) were stated in the congressional committee reports as follows:

It appears anomalous, for example, that expenses incurred in appearing before legislative bodies or before legislators are not deductible while appearances before executive or administrative officials with respect to administrative matters or before the courts with respect to judicial matters, are deductible where the expenses otherwise qualify as trade or business expenses. Your committee believes that the present bar on deductions with respect to legislative matters must be modified to place presentations to the legislative branch of government on substantially the same footing in this regard as that which obtains in the other two coordinate branches of government.

It is also desirable that taxpayers who have information bearing on the impact of present laws, or proposed legislation, on their trades or businesses not be discouraged in making this information available to members of Congress or legislators at other levels of Government. The presentation of such information to the legislators is necessary to a proper evaluation on their part of the impact of present or proposed legislation. The deduction of such expenditures on the part of business also is necessary to arrive at a true reflection of their real income for tax purposes. In many cases making sure that legislators are aware of the proposed legislation may be essential to the very existence of a business. The deduction of legislative expenses for those who incur them for personal reasons is not proposed here, since personal expenses are not deductible with respect to administrative or judicial presentation and have no bearing in the determination of true taxable income of a business.

H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 421; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 728-729.

In our opinion, section 162(e) was but a limited departure from prior law. Senator Kerr, designated Senate floor manager of the Revenue Act of 1962, in discussing section 3, H.R. 10650, in floor debate said:

Although not explicitly provided for in the statute, court decisions in the *Cammarano* and *Strauss* cases have interpreted long-existing Treasury regulations as denying a deduction for expenses incurred in making appearances, submitting materials, or communicating with respect to legislative matters.

The House version of the bill would modify these court interpretations of existing law, in order to permit deductions for expenses relating to appearances before presentation of statements to, or communications sent to a legislative body, committee, or individual legislator at any level of government if the expenses are otherwise ordinary and necessary business expenses * * * This *provision does not permit the deduction of*

*expenses incurred in attempts to influence the general public*, or large groups of the *public, through advertising or other compaigns*, nor does it permit the deduction of expenses associated with political campaigns. [Senator Kerr, 108 Cong. Rec. 17754 (1962); emphasis added.]

In enacting section 162(e), Congress was aware that expenses incurred in connection with the passage or defeat of an initiative were not previously or presently deductible. Had Congress intended to make deductible such expenses, it could have expressly done so; it did not.

Petitioners argue that the general electorate acts as a "legislative body" with respect to initiatives;[9] thus, because Southern Pacific had a direct interest in the outcome of the propositions which it supported or opposed, the requirements of section 162(e)(1) are met. We believe this argument is flawed.

We agree that Southern Pacific had a direct interest in the propositions it supported or opposed; however, we do not agree that the electorate is a "legislative body of a State" within the purview of section 162(e)(1)(A). Admittedly, the electorate can cause legislation to be adopted through the initiative process, but to hold that the electorate is a "legislative body" would be to strain the common meaning of the words. In our opinion, a "legislative body of a State," for purposes of section 162(e)(1)(A), means a governmental legislative unit. However, assuming arguendo that the electorate is a "legislative body of a State," section 162(e)(2)(B) nonetheless would deny a deduction for the expenses involved herein because such expenses would be incurred in connection with an attempt to influence a segment of the general public "with respect to legislative matters."

---

[9]The taxpayers in *Cammarano* sought to distinguish their situation from that involved in *Textile Mills Securities Corp. v. Commissioner*, 314 U.S. 326 (1941), wherein the Court upheld the Comissioner's disallowance of a deduction for sums paid by a corporation to help secure the passage of certain legislation. In response to this argument, the Court said:

"Likewise unpersuasive is petitioners' suggested distinction between expenses incurred in attempting to promote or defeat legislation pending before the legislatures and those incurred in furthering or combatting an initiative measure. We think that initiatives are plainly 'legislation' within the meaning of these Regulations. Had the measures involved in these cases been passed by the people of Washington and Arkansas they would have had the effect and status of ordinary laws in every respect. The Constitutions of the States of Washington and Arkansas both explicitly recognize that in providing for initiatives they are vesting legislative power in the people * * * [*Cammarano v. United States*, 358 U.S. at 505-506; fn. ref. omitted.]"

Petitioners argue that the political processes (i.e., initiatives, constitutional amendments, or local propositions), the expenses for which they are claiming deductions, are not included in the proscribed processes set forth in section 162(e)(2)(B). They argue that if initiatives or constitutional amendments are legislative matters within the purview of section 162(e)(2)(B), "then there would be no reason to separately exclude referendums from this limitation because referendums involve questions posed by the electorate [to the legislature]." We believe the initiative process constitutes a "legislative matter" for purposes of section 162(e)(2)(B). Further, we note that section 1.162-20(c)(2), Income Tax Regs., sets forth those expenses incurred after December 31, 1962, with respect to legislative matters which are deductible. Section 1.162-20(c)(1), Income Tax Regs., states that "All other expenditures for lobbying purposes, for the promotion or defeat of legislation (see paragraph (b)(2) of this section) * * * are not deductible." Paragraph (b)(2) of section 1.162-20, Income Tax Regs., specifically disallows a deduction for an expenditure which attempts to "Influence the public to approve or reject a measure in a referendum, initiative, vote or a constitutional amendment, or similar procedure." Thus, the Treasury regulations expressly disallow deductions for expenses incurred in attempting to influence the public with respect to initiatives.

## 2. Overpass Issue

### FINDINGS OF FACT

During the years in issue, Southern Pacific spent approximately $4.9 million in connection with the construction of 47 public highway overpasses above its railroad tracks and roadbeds.[10] Most of these overpasses were located in

---

[10]A grade separation is the intersection of a railroad line and highway at different elevations. An overpass is a grade separation where a highway is constructed over the railroad track and roadbed (railroad line). Overpasses are constructed in one of two ways. In some cases, there is excavation under an existing highway, creating a tunnel-line appearance for the railway. In other cases, the highway is built up to go over the railway. An underpass is a grade separation where the highway crosses under the railroad line. A crossing-at-grade is the intersection of a highway and the railroad line at the same elevation.

The purpose of both an overpass and an underpass is to separate railroad and motor vehicle traffic, which in turn provides increased safety and accelerates movement of highway traffic.

California[11] and were constructed to replace existing crossings-at-grade and overpasses.

The expenditures incurred by Southern Pacific with respect to the California overpasses were made as a result of orders issued by the California Public Utilities Commission.[12] In accordance with applicable California law, Southern Pacific paid 10 percent of the overpass construction costs (plus capitalized savings on maintenance). The amounts contributed by Southern Pacific for the overpass projects were recorded in Interstate Commerce Commission (ICC) capital account number 39 (Public Improvements; Construction).[13]

For each overpass project, Southern Pacific conveyed (by deed or indenture) to the governmental body concerned an easement to "construct, reconstruct, maintain, and use" the overpass as a public highway above its right of way so long as the overpass was used as a public highway. In the event the governmental body abandoned the use of the property as a highway, the rights granted by Southern Pacific to the governmental body ceased, and Southern Pacific had the right to resume exclusive possession of the property.

Each overpass was designed and built to accommodate Southern Pacific's specific needs. Southern Pacific and the governmental bodies both exercised varying degrees of control over the construction of the overpass structures. In a few cases, Southern Pacific exercised complete control over the construction of the overpasses. In such cases, it sought bidders, let the contract, approved all bills, and supervised the construction process. However, in most cases, Southern Pacific exercised little control over the construction, but, in every instance it made a final inspection of the contractor's work. After the overpass structures

---

The parties stipulated that "the maximum speed at which trains could pass through the respective grade crossings at issue was usually the same after completion of the overpass projects as it was before the overpass projects were built."

[11]For purposes of this case, the parties selected several overpass projects, each located in California, as representative of all 47 overpass projects involved herein.

[12]In the State of California, the Public Utilities Commission is responsible for authorizing the construction of every crossing-at-grade, overpass, and underpass structure. A Public Utilities Commission form is required to be filed for all such construction and a Public Utilities Commission Order is required before any new crossing-at-grade, overpass, or underpass can be built.

[13]Payments made in connection with underpass projects were recorded in ICC capital account number 6 (Bridges, Trestles, and Culverts).

were constructed, the structures generally were maintained by the governmental body, rather than by Southern Pacific.

By letter dated January 16, 1945 (the terms letter), effective January 1, 1943, respondent granted Southern Pacific permission to change from retirement to depreciation accounting with respect to its road property, including overpass structures recorded in ICC capital account number 39. For the years here in issue, respondent allowed petitioners to take a depreciation deduction with respect to each of the 47 overpass structures.

The overpass structures are tangible property which have a limited useful life due to normal deterioration and obsolescence. The useful life of the overpass structures is in excess of 4 years.

Petitioners claimed an investment tax credit of $342,299 with respect to their investment in the 47 overpass structures which for the most part respondent disallowed. Respondent concedes that Southern Pacific is entitled to an investment tax credit with respect to certain expenditures in connection with the underpass projects and crossings-at-grade, but he contends that the overpass structures do not qualify for such a credit. He also concedes that Southern Pacific is entitled to an investment tax credit with respect to certain grading costs incurred in connection with the construction of the overpasses.

## OPINION

Section 38 permits a tax credit (in an amount based on the taxpayer's qualified investment in the property, as determined under section 46) for investments in certain property known as "section 38 property." Section 38 property is defined in section 48(a)(1). The relevant portion of section 48(a)(1) provides:

the term "section 38 property" means— * * * tangible property * * * used as an integral part of * * * furnishing transportation, * * * Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.

Respondent contends that the overpass projects do not qualify as section 38 property for three reasons. First, he argues that Southern Pacific did not acquire a depreciable interest in the overpasses. In this regard, respondent claims that the overpass structures were owned by the governmental bodies and that Southern Pacific's interest in the overpasses was "intangible,"[14] in the nature of a long-term benefit arising from the separation of the highway and railroad line. Second, respondent claims that Southern Pacific did not use the overpasses as an integral part of furnishing transportation. Finally, respondent argues that the overpasses were used by governmental units and therefore the restrictions of section 48(a)(5) bar Southern Pacific's claim for the investment tax credit.[15]

Before addressing the arguments raised by respondent, we note our concern as to respondent's logic in denying Southern Pacific an investment tax credit for expenditures incurred in the construction of an overpass and, at the same time, admitting that Southern Pacific is entitled to an investment tax credit for expenditures incurred in the construction of an underpass. Overpasses and underpasses serve identical functions: both are essential to the furnishing of rail transportation, and both enable Southern Pacific's rail operations to be safer and more efficient by eliminating the risk of vehicle and train collisions. The only difference between the two is that vehicles travel on overpasses, whereas trains travel on underpasses. This, we believe, is an inconsequential difference insofar as the tax laws are concerned.

As previously stated, respondent argues that for purposes of the investment tax credit, Southern Pacific does not have a depreciable interest in the overpasses. Respondent makes this argument notwithstanding his admission that Southern Pacific is entitled to depreciate (pursuant to the terms letter) its $4.9 million investment in the overpasses. See *Denver & Rio Grande Western Railroad Co.*, 32 T.C. 43 (1959), affd. 279 F.2d 368 (10th Cir. 1960). If Southern

---

[14]Presumably, respondent means that Southern Pacific did not have a present property interest (rather than an intangible interest) in the overpass structures.

[15]Sec. 48(a)(5) provides, in relevant part:

Property used by * * * any State or political subdivision thereof * * * shall not be treated as section 38 property.

Pacific is entitled to a depreciation deduction for its $4.9 million investment in the overpasses, it would appear to follow that Southern Pacific has a depreciable interest in the overpasses for purposes of the investment tax credit.

The overpasses are tangible property which have a limited useful life due to deterioration and obsolescence. They were built on Southern Pacific's property as a result of easements granted to the concerned governmental body. Southern Pacific invested $4.9 million in connection with the construction of the overpasses. Each overpass was designed and built to accommodate Southern Pacific's specific needs. Although Southern Pacific was not involved in the construction of all the overpasses, in every instance it made a final inspection of the contractors' work to insure that the completed structure met its specifications. Further, Southern Pacific retained the right of possession of the overpasses if and when they were no longer used as public highways. We therefore conclude that Southern Pacific had a depreciable interest in the overpass structures.

Respondent argues that the overpasses were owned by the concerned governmental bodies and that Southern Pacific did not have a present interest in the overpasses but rather enjoyed long-term benefits by reason of the separation of the highway from the railroad line. Respondent's rationale for this argument is that the governmental bodies maintained the overpasses and therefore Southern Pacific did not have the burden of ownership. We do not agree.

Ownership and maintenance are not synonymous. See *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985). In our opinion, Southern Pacific was a co-owner of the overpasses. It possessed the same type of interest in the overpasses as it possessed in the underpasses and crossings-at-grade, and respondent allowed an investment tax credit for expenditures incurred in constructing these structures. Southern Pacific's "burdens of ownership" of the overpasses was its $4.9 million expenditure and the possibility that it would have to incur additional costs to replace or expand the overpasses should the California Public Utilities Commission so order.

Further, section 48(a) does not restrict the definition of "section 38 property" to property owned by a taxpayer. In

fact, an ownership requirement is nowhere to be found in sections 38, 46, or 48. Section 46 speaks of investment while section 48 refers to property with respect to which depreciation is allowable. Here, Southern Pacific had a $4.9 million investment in the overpass structures, and respondent conceded that depreciation is allowable with respect to Southern Pacific's investment in the overpasses. Hence, both the investment requirement of section 46 and the depreciable interest requirement of section 48 are satisfied.

Respondent cites numerous cases, including *Kauai Terminal, Ltd. v. Commissioner*, 36 B.T.A. 893 (1937), and *Algernon Blair, Inc. v. Commissioner*, 29 T.C. 1205 (1958), in support of his position. All of the cases cited by respondent are distinquishable from the instant case because none of the cited cases involved the allowance of the investment tax credit. In *Kauai*, the issue presented was whether the taxpayer could expense its investment in constructing a breakwater. In *Algernon Blair*, the taxpayer (a general contractor) desired to depreciate sidewalks, curbs, and paved streets which it had constructed and turned over to the local government. In the instant situation, depreciation of the overpasses is not an issue; hence, we need not further discuss the cases cited by respondent.

Respondent next argues that the overpasses were not used by Southern Pacific as an integral part of furnishing transportation. In support of his argument, respondent states that "the overpasses are built to carry motor vehicles, not trains, as the overpasses were part of the public road systems." We find this argument to be flawed. Although the public actually travels on the overpasses, Southern Pacific uses the overpasses as an integral part of furnishing transportation because the overpasses, like underpasses, enable Southern Pacific to operate its trains in a safer and more efficient manner. The fact that the public, and not Southern Pacific, actually travels on the overpasses does not diminish the benefit of the overpasses to Southern Pacific. Thus, we hold that Southern Pacific uses the overpasses to furnish transportation within the purview of section 48(a)(1).

The final argument we must address is whether the restrictions of section 48(a)(5) bar Southern Pacific's claim

for an investment tax credit. Section 48(a)(5) excludes from the definition of section 38 property any property used by a State or political subdivision. Respondent posits that the overpasses provide public safety, which is an inherent duty of governmental bodies, and that such use can be considered use by a governmental body within the meaning of section 48(a)(5). In our opinion, governmental bodies are not using the overpasses within the meaning of section 48(a)(5). Rather, it is the motoring public and Southern Pacific which are using the overpasses.

In order to ascertain the proscribed "governmental use" under section 48(a)(5), we must remain cognizant of the intended function of the investment tax credit. The investment tax credit was enacted to stimulate investment in the modernization and expansion of certain business assets by reducing their net acquisition cost. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405. Because the demand of the Government for property typically is inelastic (that is, Government consumption is not significantly increased by a lower price), property used by the Government was excluded from entitlement to the investment tax credit. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 416.

Here, Southern Pacific's decision to build the overpasses was a financial decision. It did not have to build the overpasses. When the Public Utilities Commission required a grade separation, Southern Pacific could have discontinued its train operations or it could have appealed the decision to build an overpass.[16] Thus, in our opinion, the investment tax credit served to stimulate Southern Pacific's decision to construct the overpasses by reducing the cost of construction; and by reducing its construction cost, Southern Pacific was able to modernize its railroad operations.

In conclusion, we find that petitioners are entitled to the investment tax credit with respect to Southern Pacific's expenditures for overpasses.[17]

---

[16]Had the Public Utilities Commission or a higher authority decided that an underpass should be built rather than an overpass, then there would be no question but that Southern Pacific would be entitled to an investment tax credit for its cost of construction.

[17]At trial, petitioners objected to the admission of certain exhibits relating to the overpass issue. We believe, and thus hold, these documents are admissible.

To reflect the foregoing, and the numerous concessions by both parties,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, CHABOT, NIMS, KÖRNER, SHIELDS, HAMBLEN, SWIFT, WRIGHT, PARR, WELLS, and WHALEN, *JJ.*, agree with the majority opinion.

CLAPP, GERBER, and RUWE, *JJ.*, did not participate in the consideration of this opinion.

———————

WHITAKER, *J.*, dissenting: I dissent from that part of the majority's opinion holding that petitioners' contributions to the cost of highway overpasses constitute interests in property eligible for the investment tax credit allowed under section 38. As the majority notes, section 38 property includes *tangible* property used in furnishing transportation. But the fact that tangible personal property was used in construction of the overpasses does not answer the question as the majority seems to assume. We must ascertain whether petitioners had interests in those tangible properties and, if so, the nature of their interests in order to determine whether, as to petitioners, the interests are section 38 property. I conclude that petitioners' interests are intangible property rights, which are not eligible for the credit. Moreover, section 48(a)(5) excludes from the definition of section 38 property any property used by any State or political subdivision or agency thereof. The highway overpasses in this case are parts of the public highway systems of the various States involved. They are, therefore, both owned and used by and for a State or a subdivision or agency thereof.

### The Nature of Petitioners' Interests in Overpasses

Without citation of authority, the majority holds that the petitioners are co-owners of the overpasses. However, the majority ignores the facts that the agreements for construc-

tion of the representative overpasses[1] state that the overpasses are to become part of the highway system of the governmental bodies. The majority's analysis does not take into account the nature of an easement granted for public highway purposes, ignores the differences between dominant and servient estates, and the consequences of construction of public highway overpasses by the dominant estate holder.

Petitioners' interests in the overpasses can only be predicated upon one or the other of two factors: (1) Petitioners owned that part of the right of way upon or over which the overpasses were constructed[2] and (2) petitioners contributed to the construction cost. Petitioners granted to each governmental body an easement or easements to construct the overpasses, the easements enduring so long as the overpasses were used as part of the particular public highway. If abandoned, the easements would terminate and all public rights would cease. The majority apparently assumes (and perhaps correctly) that upon abandonment petitioners would acquire legal title to whatever steel and mortar then constituted the overpass. See generally 39 Am. Jur. 2d, Highways, Streets and Bridges, sec. 184. But an executory interest or any other future interest maturing upon abandonment of an overpass does not give to petitioners a present interest in and certainly not co-ownership of the tangible property constituting the overpass, that is, in the materials used to build the structure to the extent of petitioners' contribution to the cost thereof.

The California Supreme Court long ago held that the interest acquired in land for a public highway is held for the benefit of the public. *People v. Marin County*, 103 Cal. 223, 37 P. 203 (1894). In this case the State, in its capacity as the owner of the fee under a public highway, adjacent to which the State had constructed a prison, sought to enjoin Marin County from removing gates and obstructions placed

---

[1] See note 11 of the majority opinion.

[2] The parties stipulated that petitioners "owned all or part of the railroad track line underneath the overpass." This does not necessarily mean that petitioners owned the underlying fee as distinguished from holding only a right of way. The highway overpasses may not in fact have physically touched any part of the railroad right-of-way but may merely have invaded air rights which petitioners may have possessed.

on the highway by the State. Noting that in some respects the interests of the public were involved on both sides of the lawsuit, the Court stated:

The easement of the public in and to a public highway is as sacred as any other property right, and cannot be divested by the action of the owner of the servient tenement in which it exists. No power is given either by our constitution or laws, to the board of prison directors, to abolish public highways. * * *

        *       *       *       *       *       *       *

In strictness, all public highways belong to the state, which holds them for public use subject to legislative control. In this commonwealth their custody and control outside of municipalities is confided to the supervisors of the several counties in which they are located. * * *
   [*People v. Marin County, supra* at 204, 206.]

California's treatment of public highways as State property is not unique. The Pennsylvania Supreme Court has expressly held that title to an overpass constructed with railroad money lies in the State, saying:

The Pennsylvania Railroad Company, complainant and appellant, has failed to make out title to the bridge in question over its right of way. Though constructed and paid for by it, the contract with the borough of Greensburg shows that it was so constructed as a part of the public highway Pennsylvania avenue, and to be maintained as such by the borough. * * * In either case the bridge became part of Pennsylvania avenue, and title is in the borough. [*Pennsylvania R. Co. v. Greensburg, J & P St. Ry. Co.*, 176 Pa. 559, 35 A. 122, 129 (1896).]

The majority makes much of respondent's concession in 1945 that costs which are included in Interstate Commerce Commission capital account number 39 are depreciable. That account, entitled "Public Improvements; Construction," includes overpass costs. Respondent's concession also apparently extends to highway crossing and underpass expenditures, and the majority sees no difference in these situations. While the latter fact situations are not before us, there are obvious distinctions. Railroads have tracks and other facilities in actual use at grade crossings. In the case of underpasses, some portion, perhaps a major portion, of the cost is needed to support the railroad tracks passing above the tunnel.[3]

---

[3]To the extent the majority is influenced by the treatment given petitioners' expenses for financial accounting purposes, it should be noted that treatment for financial accounting

Section 48(a)(1) requires that in order for property to be eligible for the section 38 credit, it must be "property with respect to which depreciation (or amortization in lieu of depreciation) is allowable." The majority states that "If Southern Pacific is entitled to a depreciation deduction for its $4.9 million investment in the overpasses, it would appear to follow that Southern Pacific has a depreciable interest in the overpasses for purposes of the investment tax credit." However, while all section 38 property must be depreciable or amortizable, it does not follow that all depreciable or amortizable property is eligible for the section 38 credit. The majority's treatment is, therefore, a nonsequitur.

In appropriate circumstances, an expenditure can result in a depreciable asset although title is held by a third party. See and compare *Algernon Blair, Inc. v. Commissioner*, 29 T.C. 1205, 1221 (1958), with *D. Loveman & Son Export Corp. v. Commissioner*, 34 T.C. 776, 806 (1960), affd. 296 F.2d 732 (6th Cir. 1961). In the latter case, we found that the public street was "property used in the trade or business" of the petitioner because it provided access to the petitioner's place of business. Therefore, petitioner's expenditure for resurfacing the street was depreciable. Similarly, in *Denver & Rio Grande Western Railroad Co. v. Commissioner*, 32 T.C. 43 (1959), affd. 279 F.2d 368 (10th Cir. 1960), we required the railroad to capitalize the railroad's investment in a highway overpass, presumably resulting in depreciation or amortization. It should be noted in this context that section 167 refers to property in general terms which is to be distinguished from the definition of section 38 property as tangible property. See, e.g., sec. 1.167(a)-3, Income Tax Regs.

I concede that petitioners did acquire an interest in the overpasses in common with other members of the public, an interest similar to that considered by us in *Kauai Terminal, Ltd. v. Commissioner*, 36 B.T.A. 893 (1937). In that case, we expressly found that the taxpayer "did not own the breakwater and had no *tangible* capital asset as a result of its expenditure." (Emphasis added.) *Kauai Terminal, Ltd. v.*

purposes is not controlling for tax purposes, even where such treatment is permitted or required by a regulatory agency. Cf. *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 15 (1974).

*Commissioner, supra* at 897. California recognizes similar intangible rights of abutting land owners in public highways. *People v. Ricciardi*, 23 Cal. 2d 390, 144 P.2d 799, 803 (1944). While the majority distinguishes the *Kauai Terminal* case on the ground that it did not involve the section 38 credit, the nature of the asset there acquired is conceptually indistinguishable from the nature of the asset acquired by petitioners. Therefore, the case should be followed.

Respondent sets forth his position in an almost identical fact situation in Rev. Rul. 69-229, 1969-2 C.B. 86. There respondent took the position that the taxpayer had acquired an interest in an intangible asset which was depreciable over the life of the structure. While we are certainly not bound by respondent's litigating position as set forth in a revenue ruling (*Stark v. Commissioner*, 86 T.C. 243, 250-251 (1986)), a sound interpretation of the law should be recognized as such.

In summary, as we recognized in a recent opinion:

As explained by the Supreme Court in *Helvering v. F. & R. Lazarus Co.*, 308 U.S. at 254, a deduction for exhaustion, wear, and tear is granted to a person who uses property in his trade or business and incurs a "loss resulting from depreciation of capital he has invested." In the seminal case of *Gladding Dry Goods Co. v. Commissioner, supra*, the lessee of a store paid for improvements to the property in return for an extension of the lease. The Board of Tax Appeals held that the lessee was entitled to depreciate the cost of such improvements over the lease term as extended. The Board explained that depreciation "is not predicated upon ownership of the property, but rather upon an investment in property which is thereafter used. * * * The material elements are, the person who makes the investment, use of the property, and the period over which that investment is to be recovered out of income." 2 B.T.A. at 338-339. * * * [*Tolwinsky v. Commissioner*, 86 T.C. 1009, 1047 (1986).]

An asset to be depreciated may be tangible property or an intangible right so long as it has been placed in service in or prior to the year involved and is actually used in the taxpayer's business. Petitioners here acquired an intangible property right for their investment, the right in common with the public to use the overpass. This remote connection with petitioners' business does not qualify as business use for purposes of the investment tax credit. Petitioners may also have acquired a future interest in the overpasses. But

that too is not section 38 property.[4] Depreciation is permissible; investment tax credit is not.

### Section 48(a)(5)

Even if petitioners were held to have acquired an interest in tangible property, section 48(a)(5) operates to deny petitioners an investment tax credit for their expenditure. Section 48(a)(5) excludes from the definition of section 38 property any property used:

> by the United States, any state or political subdivision thereof, * * * or any agency or instrumentality of any of the foregoing * * *

While investment credit was enacted "to provide a stimulant to the economic growth of this country," it was not extended to property described in section 48(a)(5) "since allowing the [taxpayer] in such cases an investment credit would not be expected to increase the use of such property by the governmental units." H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 416. At least one court has stated that property so used was excepted from the definition of section 38 property "since the in-elastic demand of governmental units is not subject to stimulation resulting from lowered costs." *Stewart v. United States*, an unreported decision (D. Neb. 1977), 40 AFTR 2d 77-5735, 77-2 USTC par. 9648, at 88,175.

Petitioners argue that their position is supported by Rev. Rul. 78-268, 1978-2 C.B. 10. That ruling involved an electric generating facility owned by two privately held corporations, a municipality and an electric cooperative exempt from tax under section 501(c)(12).[5] The facility was owned by the four parties as tenants in common, with the city and cooperative each owning a 4-percent interest in the facility. The company seeking the investment credit was to operate the facility on behalf of all participants and was paid an amount not in excess of the fair market value of its services. It was held that the disallowance of the investment credit in respect of the interests of the municipality

---

[4]See our discussion which follows with respect to the purpose of the investment tax credit.

[5]Sec. 48(a)(4) provides that property used by certain tax exempt organizations shall be treated as sec. 38 property only if such property is used predominantly in an unrelated trade or business, the income from which is subject to tax under sec. 511.

and the cooperative did not render the corporations' investments in the facility ineligible for the investment credit.

Even if revenue rulings had precedential value, which they do not (*Stark v. Commissioner, supra*), this ruling is distinguishable. Public utilities, even though quasi-governmental organizations[6] are profit-oriented businesses which the investment tax credit was enacted to assist. Conversely, "whenever the necessities or convenience of the public require a road or highway for the purpose of trade or travel, it is the duty of the government to provide one." 39 Am. Jur. 2d, Highways, Streets and Bridges, sec. 32 (1968). Such an activity is, by its very nature, carried on only by a governmental body in its capacity as such and according to the needs of its citizens. It is not carried on in part to take advantage of favorable tax laws, and those laws could not here have influenced petitioners' expenditures, since they were required by the appropriate public utilities commission or like State agency.

The ruling is also distinguishable in that the municipality and cooperative had only an 8-percent combined interest in the asset. Here, the governmental bodies made 90 percent of the expenditure and had a 100-percent possessory interest. While no authority exists which requires ascertainment of the quantum of use by a governmental body in order to find section 48(a)(5) to be applicable, we noted in *World Airways, Inc. v. Commissioner*, 62 T.C. 786, 811-813 (1974), affd. 564 F.2d 886 (9th Cir. 1977), that Congress had, in other parts of section 48, employed a predominant-use test for determining whether property was eligible for the investment credit. Noting that section 48(a)(5) does not employ such a test, we stated that:

The only reasonable conclusion is that section 48 embodies a "predominant use" test and a "use" test and that different amounts of use in the prescribed activities operate to exclude property from qualifying as section 38 property. It is apparent that the provision specifying a predominant-use test explicitly authorized a substantial amount of use in the disfavored activities. And it is equally clear that section 48(a)(5) provides for less use in the activities it concerns. * * * [Fn. ref. omitted.]

[6]*Gay Law Students Association v. Pacific Telephone & Telegraph Co.*, 24 Cal. 3d 458, 595 P. 2d 592, 156 Cal. Rptr. 14 (1979); cf. *Pasillas v. Agricultural Labor Relations Board*, 156 Cal. App. 3d 312, 202 Cal. Rptr. 739, 759 (1984).

As noted by the District Court in *Stewart v. United States, supra,* "the statute does not require exclusive use or even predominant use by the Government before the property is to be excluded from qualification for the investment tax credit." 40 AFTR 2d at 77-5737, 77-2 USTC par. 9648, at 88,176. However, in fact each overpass was used exclusively as a part of a particular public highway system, entirely a governmental use.

Further, respondent's regulations equate use by a governmental body with ownership. Sec. 1.48-1(k), Income Tax Regs. Even if, as the majority finds, petitioners were co-owners of the overpasses, which they are not, it is clear that the greater interest in those structures was held by the governmental bodies by virtue of their greater investment. To paraphrase *Stewart,* governmental ownership need be neither exclusive nor predominant, and the fact that the respective governmental bodies paid 90 percent of the cost of the overpasses, which were then included in that body's highway system, counsels strongly in favor of excluding the property from the definition of section 38 property.

Despite respondent's concession on brief,[7] I fail to see how a public highway cannot be used by a governmental body having authority over it. See *People v. Marin County,* 103 Cal. 223, 37 P. 203 (1894). That portion of the price of construction of the overpasses paid by the governmental bodies is indicative of the use made of the overpasses by those bodies. Further, the fact that the overpasses were built to either replace existing overpasses or crossings at grade indicates a use sufficient to require upgrading of the facilities. If in fact petitioners had a present property interest in the overpasses, the predominant use by the respective governmental bodies is sufficient to remove them from the definition of section 38 property.

Accordingly, for either of these two grounds, petitioners are not entitled to investment tax credits.

PARKER, COHEN, and WILLIAMS, *JJ.,* agree with this dissent.

---

[7]"Respondent is not contending that use by the general motoring public constitutes use by governmental bodies." Respondent's Reply Brief at 49.