T.C. Memo. 1999-111


UNITED STATES TAX COURT


ROBERT J. GEARY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7380-97.                     Filed April 2, 1999.


<u>Stephen M. Moskowitz</u> and <u>Robert L. Goldstein</u>, for
petitioner.

<u>Margaret S. Rigg</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GOLDBERG, <u>Special Trial Judge</u>:  This case was heard pursuant
to the provisions of section 7443A(b)(3) and Rules 180, 181, and
182.  Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue, and

all Rule references are to the Tax Court Rules of Practice and
Procedure.

Respondent determined a deficiency in petitioner's 1993
Federal income tax in the amount of $3,499 and an accuracy-
related penalty in the amount of $700 pursuant to section
6662(a).

After concessions,[1] the issues for decision are: (1) Whether
petitioner is entitled to claim a Schedule C advertising expense
deduction for the 1993 tax year; and (2) whether petitioner is
liable for an accuracy-related penalty pursuant to section
6662(a) in the amount of $700 for the 1993 tax year.

Some of the facts have been stipulated and are so found.
The stipulation of facts and the attached exhibits are
incorporated herein by this reference.  At the time the petition
was filed, petitioner resided in San Francisco, California.

FINDINGS OF FACT

During the year in issue, petitioner was a full-time police
officer for the City and County of San Francisco.  Petitioner was
a 24-year police veteran who had been decorated four times for
valor.

In 1991, the San Francisco Police Department started a
Community Police on Patrol Program (Patrol Program) which was
designed to encourage patrol officers "to be a highly visible

---

[1]     Petitioner conceded respondent's adjustments of claimed 1993
Schedule C deductions for supplies and legal expenses.

presence in the city's neighborhoods" and "encouraged [police officers] to engage in responsible, creative ways to make the community safer and more attractive."

After attending a course on the Patrol Program at the police academy, petitioner purchased a ventriloquist dummy/puppet. Petitioner named the puppet Officer Brendan O'Smarty (Officer O'Smarty) and outfitted him in a San Francisco Police Department uniform complete with badge[2] and water pistol. Petitioner began to patrol his beat with Officer O'Smarty in 1991.

Petitioner patrolled the North Beach District of San Francisco, an area with a multicultural mix of people speaking several different languages. Petitioner felt that a ventriloquist puppet such as Officer O'Smarty helped petitioner improve his working relationship with residents of North Beach by making petitioner more approachable and less forbidding.

Though petitioner's supervisors at the police department initially permitted petitioner and Officer O'Smarty to patrol together "for a year or so", they later ordered petitioner to stop taking Officer O'Smarty on patrol. Petitioner met with police officials in an attempt to get the order rescinded but was only partially successful. The Chief of Police of the San Francisco Police Department modified the order, but petitioner

---

[2] Petitioner issued Officer O'Smarty badge No. ½.

was still prohibited from taking Officer O'Smarty on patrol without advance written permission.

In response to the restrictions on petitioner's use of the puppet, the San Francisco Board of Supervisors (Board) passed a resolution "[urging] the Mayor to urge the Police Commissioner to allow [petitioner] police officer Bob Geary to use his professional judgement in using non-traditional 'tools' to gain the trust of the public."  The Mayor refused to act on the Board's resolution, and petitioner, after exhausting his administrative remedies, decided to take the Officer O'Smarty puppet issue to local voters.

In the latter part of 1992, or early in January 1993, petitioner formed the Committee to Save Puppet Officer Brendan O'Smarty (Committee).  Through the Committee, petitioner paid $9,711.49 to professional "signature gatherers" to circulate petitions and gather signatures from local voters in order to place the issue on the November 1993 ballot.  Once the signatures were gathered, petitioner contributed $1,200 to local political organizations which recommended passage of "Proposition BB", the Officer O'Smarty proposition.[3]  In addition, petitioner paid $621

---

[3]     Petitioner contributed $600 to the Richmond District Democratic Club, $400 to the District Eight Democratic Club, and $200 to the Affordable Housing Alliance Political Action Committee, all of which endorsed Proposition BB on their respective slates.

to the Registrar of Voters in order to include a lengthy pro-Officer O'Smarty statement in voting materials.

Proposition BB asked voters to decide whether it should "be the policy of the people of San Francisco to allow Police Officer Bob Geary to decide when he may use his puppet Brendan O'Smarty while on duty." Voters ultimately approved Proposition BB and petitioner was once again allowed to patrol the streets of San Francisco with Officer O'Smarty.

On or about November 13, 1992, petitioner signed an option agreement with Golden Door Productions (Golden Door), a movie studio, whereby Golden Door would use its best efforts to exploit the concept of using petitioner and Officer O'Smarty in various law enforcement scenarios suitable for motion pictures, television, etc.[4] This option agreement was subsequently amended by agreement prepared on September 3, 1993. In 1993 Golden Door assisted petitioner to enter into a contract with Interscope Communications (Interscope).

Petitioner attracted significant media attention as a result of his high-profile ballot campaign.[5] Petitioner was able to

---

[4] The precise terms of this contract are unclear as the contract does not appear in the record.

[5] See Jane Gross, Dummy is on Ballot (He isn't Seeking Office), "New York Times", Oct. 30, 1993, at A-1. Petitioner also spoke to local community groups and schools and even attracted international attention. Foreign media interest was generated in Turkey, Portugal, Australia, Britain, Canada, and Sarajevo.

capitalize on the resultant publicity to develop commercial interest in his unique patrol ideas.

Interscope paid petitioner $10,000 under the contract for consulting services in connection with the development of a screenplay, which income petitioner reported as wage income on his 1993 Federal income tax return.[6]  Petitioner also received $4,500 from Golden Door Productions, the movie studio which helped petitioner sell his idea to Interscope, and $2,216 from miscellaneous sources for various appearances as a "hand model" and as an "entertainer".  Petitioner reported these amounts, a total of $6,716, on Schedule C attached to his 1993 Federal income tax return.  Petitioner claimed an $11,465 advertising expense deduction on Schedule C representing petitioner's total ballot expenditures for Proposition BB.[7]

---

[6]  Petitioner is still under contract with Interscope.  If Interscope exercises the option and a movie is ever made, petitioner will earn $25,000 as a consultant, plus 15 percent of the fee which would be paid to the producers of the film, and 33 percent of the profits to be paid to the producers from any assignment of the story.

[7]  This amount includes $9,711.49 for signature gatherers, $1,200 in contributions to local political organizations that endorsed Proposition BB on their local slates, and other miscellaneous expenses.  Though petitioner only claimed as advertising expenses the amount of $11,465 on Schedule C of his 1993 Federal income tax return, the parties stipulated that petitioner incurred total ballot expenses in the amount of $11,645.  The difference between these two numbers seems to be a transpositional error.

In a notice of deficiency dated January 16, 1997, respondent disallowed petitioner's total claimed Schedule C advertising expense deduction for the 1993 tax year.  Respondent contends that petitioner's claimed advertising expenses were actually lobbying and political expenditures which are disallowed by section 162(e).

OPINION

Deductions are a matter of legislative grace.  See New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  A taxpayer bears the burden of proving that he is entitled to claimed deductions.  See Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioner has advanced two alternative arguments in support of his claim that the expenses incurred should be allowable as an ordinary and necessary business deduction:  (1) Petitioner contends that the claimed deduction represents Schedule C business expenses incurred by petitioner in his business as an entertainer; or, alternatively, (2) petitioner contends that the expenditures represent unreimbursed employee business expenses which are deductible on Schedule A.

1.   Section 162(e)(2)(B) Exclusion

Relying on Section 162(e), respondent contends that petitioner would not be entitled to deduct his claimed expenses even if they otherwise had been allowable deductions under section 162(a).

Section 162(e)(2)(B) prohibits a deduction for any amount paid or incurred "in connection with any attempt to influence the general public, or segments, thereof, with respect to legislative matters, elections, or referendums."

Petitioner contends that section 162(e)(2)(B) is inapplicable in this case, but concedes that if this Court finds section 162(e)(2)(B) applicable, then expenses incurred by petitioner in obtaining voting slate approval for Proposition BB from various political groups totaling $1,200 would be nondeductible. Petitioner contends, however, that expenses incurred by petitioner for the use of signature gatherers would not be prohibited since petitioner's use of signature gatherers was not an "attempt to influence the general public". We disagree.

Petitioner contends that his sole purpose in getting the Officer O'Smarty issue on the ballot was to let the voters decide the issue. Petitioner thereby claims a disinterest in the outcome of the vote though his actions at the time indicate otherwise.

Petitioner organized his Committee with the express purpose of "saving" Officer O'Smarty. Indeed the very name of the Committee, the Committee to Save Puppet Officer Brendan O'Smarty, is a good indication of its purpose. Petitioner funded the ballot proposition entirely through the Committee and paid the signature gatherers with Committee funds.

Petitioner's signature gatherers were employed to gather signatures with the express purpose of putting the puppet issue on the November 1993 ballot. These signature gatherers were paid by petitioner's Committee and certainly made statements supporting the inclusion of the issue on the November 1993 ballot while gathering signatures from the public in San Francisco.

This Court has consistently held that expenses incurred to influence the public with respect to legislative matters, decisions, or referendums are nondeductible. See Cloud v. Commissioner, 97 T.C. 613 (1991); Southern Pac. Transp. Co. v. Commissioner, 90 T.C. 771, 780-782 (1988). Taken as a whole, petitioner's actions show a clear intent to influence the general public. Petitioner formed his Committee, funded it with his own money, sent out signature gatherers to qualify the issue for the November 1993 ballot, and then secured voting slate approval of Proposition BB from local political organizations. Petitioner is now attempting to break out certain expenses and narrowly isolate those expenses so they do not fall under the section 162(e)(2)(B) exclusion. We are not persuaded by his argument in that respect. Petitioner's claimed expenses are disallowed by section 162(e)(2)(B).

We therefore hold that petitioner is not entitled to claim expenses incurred in putting the Officer O'Smarty issue on the November 1993 ballot as section 162 deductions on his 1993 Federal income tax return.

Inasmuch as we hold that section 162(e) is dispositive of the issue, we need not address petitioner's contentions that the claimed expenses represent either Schedule C business expenses or Schedule A unreimbursed employee business expenses. Respondent is sustained on this issue.

2. Accuracy-Related Penalty

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the portion of any underpayment of tax that is due to negligence or disregard of rules or regulations. Under section 6662(c), negligence is any failure to make a reasonable attempt to comply with the provisions of the Code, and the term "disregard" includes any careless, reckless, or intentional disregard. Negligence includes the failure to exercise the due care of a reasonable and ordinarily prudent person under the circumstances. See Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989); Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Petitioner contends that he is not liable for the section 6662(a) accuracy-related penalty because he relied on erroneous expert advice given by his tax preparer. When an expert provides erroneous advice on a matter of tax law, such as whether a tax liability exists, it may be reasonable for a taxpayer to rely on that advice. See United States v. Boyle, 469 U.S. 241, 250-251 (1985).

Though petitioner contends that he received erroneous tax advice from his tax preparer, petitioner did not testify to such advice or call his tax preparer as a witness at trial.  This Court can infer that testimony which was not produced at trial would not have been favorable to a taxpayer.  See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).  Additionally, there is no evidence in the record supporting petitioner's contention regarding erroneous expert advice.

On the basis of the record, we hold that petitioner did not comply with the requirements of section 162, and failed to exercise the due care of a reasonable and ordinarily prudent person.  We therefore hold that petitioner is liable for an accuracy-related penalty for the 1993 tax year.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.