NEW ENGLAND ELECTRIC SYSTEM
and Subsidiary Companies

v.

The UNITED STATES.

No. 90–3976 T.

United States Court of Federal Claims.

Aug. 3, 1993.

---

F. Brook Voght, Washington, DC, attorney of record; John L. Palmer, New England Power Service Co., J. Bradford Anwyll, and Jane Elizabeth H. Davis, of counsel, for plaintiff.

Jennifer Dover Spriggs, Washington, DC, with whom was Acting Asst. Atty. Gen. James A. Bruton, for defendant.

---

## OPINION

YOCK, Judge.

The plaintiff in this action seeks the recovery of income taxes and interest paid to the United States Government with respect to plaintiff's taxable year ended December 31, 1980. Plaintiff alleges that it is entitled to an investment tax credit on the fishway that it constructed on its hydroelectric dam, as provided for by sections 38 and 48 of the Internal Revenue Code. The parties filed cross-motions for summary judgment, and an oral hearing was held on June 22, 1993, at the National Courts Building in Washington, D.C.

Upon full consideration of the entire record, this Court concludes that the fishway is an integral part of the plaintiff's activity of furnishing hydroelectric power to its customers. Therefore, the plaintiff is entitled to an investment tax credit on the cost of constructing the fishway.

### *Factual Background*

The plaintiff in this action is the New England Electric System ("NEES"), a Massachusetts business trust and its subsidiary companies. The New England Power Company ("NEP"), a subsidiary of NEES, operates a series of three hydroelectric dams within an 80 mile stretch of the Connecticut River pursuant to a license issued by the Federal Energy Regulatory Commission ("FERC"). This action concerns the Vernon dam, located near Hinsdale, New Hampshire, and Vernon, Vermont. NEP's other two dams, Bellows Falls and Wilder, are located upstream (north) of the Vernon dam.

The Vernon dam began furnishing electric power in 1909. At that time, there were already several other hydroelectric facilities operating downstream on the Connecticut River. In 1945, the Federal Power Commission ("FPC") granted NEP a long-term license to operate the Vernon facility (retroactive to 1938) until June 30, 1970.[1] Article 13 of that license provided that NEP must operate and maintain a fishway

in accordance with the requirements of the Secretary of the Interior. As it happened, however, the Vernon dam fishway was not installed in the 1940's because several dams downstream had not yet installed fishways. This situation threatened to counter the overall effect of operating a fishway upstream, and so it was decided that these lower dams would have to install fishways first before the Vernon dam would be required to construct one.

On June 23, 1970, NEP filed an application for renewal of its Vernon dam operating license. By this time, fishways had been installed in the lower river dams and the issue of installing fishways at NEP's three Connecticut River dams arose once again. NEP was granted successive one-year annual licenses while the negotiations ensued.

In 1976, NEP began negotiating with several environmental groups, including the United States Fish and Wildlife Service, the National Marine Fisheries Service, and the Fish and Wildlife Agencies of Connecticut, Massachusetts, Vermont, and New Hampshire, for the construction of a fishway system for its three Connecticut River dams. NEP provided plans for a fishway on the Vernon dam, and negotiated to finalize all requirements relative to the fishways at all three dams.

In December 1977, NEP entered into a settlement agreement with representatives of the United States Fish and Wildlife Service and the four New England states of Massachusetts, Connecticut, Vermont, and New Hampshire to construct and install fishways on the Vernon, Bellows Falls, and Wilder dams. On October 5, 1978, FERC issued an order approving the settlement agreement. As a result of the agreement, in August, 1979, FERC granted NEP a new long-term federal license to operate the Vernon dam.

The renewed license and settlement agreement required that NEP, or any investor-owned public utility that purchases the Vernon dam, must either install and

---

1. The Federal Power Commission was abolished in 1977, and its functions were transferred to the Federal Energy Regulatory Commission. *See* 42 U.S.C. §§ 7172(a)(1)(A), 7293 (1988).

operate a fishway or remove the dam structure from the Connecticut River. Article 15 of the renewed license provided for the continuing supervision of the fishway at the Vernon facility in the following manner:

The Licensee shall, for the conservation and development of fish and wildlife resources, construct, maintain, and operate, or arrange for the construction, maintenance, and operation of such reasonable facilities, and comply with such reasonable modifications of the project structures and operation, as may be ordered by the Commission upon its own motion or upon the recommendation of the Secretary of the Interior or the fish and wildlife agency or agencies of any State in which the project or a part thereof is located, after notice and opportunity for hearing.

In addition to the fishway facility, Article 17 of NEP's license also required the construction, maintenance, and operation of reasonable recreational facilities at the dam, including access roads, wharves, launching ramps, beaches, picnic and camping areas, and sanitary facilities.

NEP constructed the fishway on the Vernon dam during 1979, 1980, and 1981.[2] The fishway is an "Ice Harbor" type, which is a vertical slot-type ladder leading from the gatehouse to the reservoir. In this design, the fish bypass the dam turbines by climbing a series of 51 step-like pools, each approximately six feet deep and one foot higher than the previous pool. The fishway provides passage from the dam's tailrace, where water is discharged from the turbines, to the 2,550 acre reservoir above the dam. The fishway also functions as a spillway to meet NEP's required minimum water flow of 1,250 cubic feet per second ("cfs") imposed by FERC, and is also available to serve as an emergency spillway when the river flow is higher than station capacity.

The fishway, which measures approximately six feet by four feet at its most restrictive point, is constructed of reinforced concrete, lies adjacent to the electric-generating facilities at the dam, and is permanently affixed to the powerhouse by rock anchors. The fishway can be operated only from the powerhouse control room, which regulates all of the dam's functions. The installation of the fishway required some physical modification of the Vernon dam, including partial removal of the powerhouse structure where the fishway attaches and modification of the wall of the dam on the upstream side where the fishway extends through and into the reservoir.

The construction of the fishway did not result in an appreciable expansion of the Vernon dam's capacity.[3] In fact, because the fishway diverts water away from the turbines, the fishway actually reduces by a minuscule amount the amount of electricity that can be generated by the Vernon dam at any given time.

NEP incurred a total cost of $9,747,546 to install the Vernon dam fishway. On its consolidated federal income tax return with NEES for calendar years 1979, 1980, and 1981, NEP claimed an investment tax credit in the total amount of approximately $952,880 for the Vernon dam fishway.[4] NEP also claimed an investment tax credit in the years 1983 and 1984 and in 1985 through 1987 for the construction of similar fishways at the Bellows Falls and Wilder dams.[5]

Between 1983 and November 30, 1984, a revenue agent audited NEES's tax returns for 1979 through 1981. Ultimately, the

---

**2.** Later, in 1984, NEP completed construction of a fishway on the Bellows Falls dam, and in 1987, NEP completed construction of a fishway on the Wilder dam.

**3.** The fishway adds only 368 cfs to the 100,000 cfs of water that the Vernon dam can pass. Thus, the fishway increases the capacity of the Vernon dam by a mere .0368 percent.

**4.** The claimed investment tax credit carried back to prior years, which is why 1980 is the taxable year at issue in this case.

**5.** The question of whether the fishways at the Bellows Falls and Wilder dams qualify for investment tax credit treatment is not an issue in this case.

revenue agent disallowed most of the investment tax credit that NEP claimed for the Vernon dam fishway. The revenue agent determined that of the total cost incurred, only $1,065,458 attributable to the tangible personal property associated with the fishway qualified for investment tax credit treatment.

During the period March, 1986 through July, 1987, the revenue agent audited NEP's returns for 1982 and 1983, and commenced an audit of NEES' returns for 1984 and 1985 in January, 1989. During these audits, the revenue agent reviewed NEP's claimed investment tax credit on all three of its Connecticut River dams. The revenue agent made a field trip to the dams and conferred with an engineer.

Ultimately, the revenue agent determined that NEP was entitled to the entire investment tax credit claimed for the Wilder dam fishway, but that only the tangible personal property associated with the Bellows Falls and Vernon dam fishways qualified for the investment tax credit.

NEES disputed the proposed disallowance of investment tax credit for the Bellows Falls and Vernon dam fishways in an administrative appeals proceeding before the Internal Revenue Service in 1987 and 1988. The Appeals officer rejected NEES's position on both dams. NEES then petitioned the United States Tax Court (Docket No. 3420–89) regarding the deficiency created in its 1983 taxable year due to the disallowed investment tax credit on the Bellows Falls fishway. Upon NEP's consultation with district counsel for the Internal Revenue Service, the Internal Revenue Service conceded the investment tax credit issue on the Bellows Falls fishway. NEES thereafter was allowed the investment tax credit for the Bellows Falls dam.

On June 12, 1985, after taking into account various adjustments, including the disallowance of the investment tax credit for the Vernon dam fishway, the IRS assessed a deficiency of $285,031.00 in tax and $145,194.48 in assessed interest for the plaintiff's taxable year ending December 31, 1980. The plaintiff paid this deficiency on July 8, 1985. On June 15, 1987, the plaintiff filed a Form 1120X for its taxable year ending December 31, 1980, claiming a tax refund of $815,073 attributable to the disallowed investment tax credit for the Vernon dam fishway. The IRS disallowed the plaintiff's refund claim, and suit was filed in this Court on November 30, 1990.

### Discussion

The sole issue in the present dispute is whether, under section 38 and section 48(a)(1)(B) of the Internal Revenue Code, the Vernon dam fishway qualifies as "other tangible property," used as an integral part of the furnishing of electrical energy, so that the plaintiff may be entitled to the investment tax credit for the Vernon dam property. The plaintiff contends that the fishway is part of the comprehensive dam structure that is an integral part of the activity of furnishing hydroelectric power. In addition, the plaintiff maintains that Congress' use of the phrase "furnishing electrical energy" contemplates a broader range of activities than the mere generation of electricity. To this end, the plaintiff argues that devices protecting people, property, and/or the environment from a qualifying business activity are integral parts of conducting that activity.

In contrast to the plaintiff's position, the Government argues that property has been found to be integral to the furnishing of a service enumerated in section 48(a)(1)(B)(i) only when the item in question actually enhances the ability of the business to provide the enumerated service. In this regard, the Government points out that the construction of the fishway did not increase the electrical production of the Vernon dam, and, in fact, marginally decreased the amount of electrical power that could be produced at any given time. Also, the Government argues that under the statutes and regulations relating to the issuance of a license to operate a hydroelectric plant on a navigable river, the requirement that NEP construct the fishway is no different than the requirement that it also provide recreational facilities at the dam.

Section 38 of the Internal Revenue Code entitles a taxpayer to claim a credit for investment in certain types of property defined in section 48. Section 48 states that "section 38 property" includes only depreciable property having a useful life of three years or more, including tangible personal property and:

> (B) *other tangible property* (not including a building and its structural components) but only if such property—
>
> (i) is *used as an integral part* of manufacturing, production, or extraction or *of furnishing* transportation, communications, *electrical energy*, gas, water, or sewage disposal services * * *.

26 U.S.C. § 48(a)(1) (1976) (emphasis added). Treas.Reg. § 1.48–1(d)(4) defines "integral part" as follows:

> Property such as pavements, parking areas, inherently permanent advertising displays or inherently permanent outdoor lighting facilities, or swimming pools, although used in the operation of a business, ordinarily is not used as an integral part of any of such specified activities. *Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity.* Thus, for example, in determining whether property is used as an integral part of manufacturing, all properties used by the taxpayer in acquiring or transporting raw materials or supplies to the point where the actual processing commences (such as docks, railroad tracks and bridges), or in processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing. Specific examples of property which normally would be used as an integral part of one of the specified activities are blast furnaces, oil and gas pipelines, railroad tracks and signals, telephone poles, broadcasting towers, oil derricks, and fences used to confine livestock.

Treas.Reg. § 1.48–1(d)(4) (April 1, 1980) (emphasis added).

As the statute and the treasury regulation make clear, not all property used by a taxpayer in one of the specified activities qualifies as section 38 property. In order to qualify for the credit, the property must be depreciable with a useful life of three years or more and must be used as an integral part of one or more of the specified activities.

Section 167 allows as a depreciation deduction a reasonable allowance for the exhaustion and wear and tear of (1) property used in a trade or business, or (2) property held for the production of income. I.R.C. § 167 (1976). There is no question that the Vernon dam fishway is depreciable property within the meaning of section 167. In addition, it is uncontested that the Vernon dam fishway has a useful life of three years or more. The central dispute in this case is whether the fishway is an *integral part* of the activity of furnishing electrical energy. According to Treas.Reg. § 1.48–1(d)(4), the key inquiry in this regard is whether the Vernon dam fishway is used directly in the activity and is essential to the completeness of the activity.

The Government maintains that the construction of the fishway was not essential to the completeness of the activity of furnishing electricity because the fishway did not enhance the ability of NEES to furnish electricity to its customers. In this vein, the Government suggests that the property is "integral" to the furnishing of a service enumerated in section 48(a)(1)(B)(i) of the Code only when the item in question actually enhances the ability of the business to provide the enumerated service. Because the fishway did not increase the output of the Vernon dam and marginally decreased the amount of electrical power that could be produced at any given time, the Government maintains that the fishway did not enhance NEES' ability to produce and furnish electricity.

This Court cannot agree with the Government's narrow reading of the Code and the regulation. Simply put, the Code and the regulation do not require that the fishway actually enhance NEP's ability to provide electricity. To reiterate, the Code requires that the property be used as an integral part of the *furnishing* of electrical

energy, while the regulation specifies that property is used as an integral part of an activity if it is used *directly* in the activity and is *essential to the completeness* of the activity. I.R.C. § 48(a)(1)(B) (1976); Treas. Reg. § 1.48–1(d)(4) (emphasis added). Other courts have interpreted these requirements quite broadly. For example, the United States Tax Court has twice held that fences installed around a facility for the purpose of deterring thieves are an integral part of the qualifying activity. *See Consol. Freightways, Inc. v. Commissioner*, 74 T.C. 768, 799, 1980 WL 4472 (1980) (fences installed around the dock facilities of a freight carrier are an integral part of furnishing transportation services), *aff'd in part and rev'd in part on other grounds*, 708 F.2d 1385 (9th Cir.1983); *Spalding v. Commissioner*, 66 T.C. 1017, 1023–24, 1976 WL 3721 (1976) (fences erected around auto wrecking business are an integral part of the manufacturing or production business). Similarly, it has been held that chain link fences and gates built around a railroad tunnel for the purpose of preventing people and animals from wandering into the approach sections qualify for the investment tax credit because they are an integral part of furnishing transportation in a metropolitan area. *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 939, 1976 WL 3722 (1976). In reaching this decision, the Tax Court in *Spartanburg* noted that public safety is as much an essential element of operating the railroad tunnel as are the railroad tracks themselves. *Id.* at 939. Finally, in *Southern Pac. Transp. Co. v. Commissioner*, 90 T.C. 771, 1988 WL 34881 (1988), the Tax Court rejected the Government's argument that overpasses built above railroad tracks and roadbeds for the purpose of carrying motor vehicles were not an integral part of furnishing railroad transportation. *Id.* at 787. The Tax Court observed that even though the public, and not trains, actually traveled on the overpasses, the overpasses were an integral part of furnishing rail transportation because they enabled the rail company to operate its trains in a safer and more efficient manner. *Id.*

The cases cited above suggest that devices protecting people and property from a qualifying business activity are an integral part of that activity. In a similar manner, the Vernon dam fishway protects fish and wildlife from the adverse effects of the hydroelectric facility and thereby minimizes interference with the surrounding ecosystem. The only credible distinction is that the devices discussed above for which investment tax credits have been allowed protect people and property, while the Vernon dam fishway protects fish and wildlife. In either case, however, the policy objective that is served by allowing an investment tax credit is the same.

Further support for plaintiff's position that the fishway is an integral part of furnishing electrical energy may be found in related tax legislation dealing with the energy credit. In 1980, Congress added section 48(*l*)(13) to the Internal Revenue Code to define the types of hydroelectric generating property which would qualify for the energy credit.[6] In this legislation, Congress *specifically included* "fish passageways" among the types of property listed as "qualified hydroelectric generating property" for purposes of the energy credit. 26 U.S.C. § 48(*l*)(13) (1988). Although this provision of the Code is not at issue in this case and is therefore not dispositive, it does provide insight into the types of property that Congress groups together within the rubric of "hydroelectric generating property." If nothing else, this Code provision suggests that when Congress squarely confronted the fishway issue in 1980, it concluded that when all of the other established criteria were met, fishways were sufficiently integral to hydroelectric generating equipment to be worthy of favorable tax treatment.

The Government contends that rather than being an integral part of the furnish-

---

6. In order to be categorized as "qualified hydroelectric generating property," the property in question must, among other things, be installed at a "qualified hydroelectric site." 26 U.S.C. § 48(*l*)(13)(A) (1988). When all of the statutory requirements are met, qualified hydroelectric generating property may qualify for the energy credit in addition to the investment tax credit.

ing of electricity, the fishway at issue was constructed to further the plaintiff's application for a license to operate the Vernon dam. Thus, it is the Government's position that under the statute and regulations relating to the issuance of the operating license, the requirement that the plaintiff construct the fishway is no different than the requirement that it also provide recreational facilities in the vicinity of the Vernon dam, which, all parties agree, do not qualify for the investment tax credit. Admittedly, this is a good argument. If the fishway qualifies for the investment tax credit simply because the plaintiff was required to install it as a condition of obtaining an operating license, then basically any item necessary for the business of furnishing electricity, including the recreational facilities that plaintiff was required to provide, would also be eligible for the investment tax credit.

The fallacy of this argument, however, lies in its premise. The Vernon dam fishway does not qualify for the investment tax credit merely because the plaintiff was required to install it as a condition of obtaining an operating license. This is but a small part of the overall package. Unlike the recreational facilities that the plaintiff was required to provide, the Vernon dam fishway is physically attached to and operates in tandem with the Vernon dam. Without the Vernon dam, there would be no reason to operate a fishway. The recreational facilities, including beaches and picnic and camping areas, in contrast, are situated away from the dam and have a utility wholly apart from the dam itself. Moreover, the Vernon dam fishway has its own discrete water management functions. In addition to providing upstream and downstream passage through the dam structure for fish and fauna, the Vernon dam fishway functions as a spillway to meet the required minimum water flow of 1,250 cubic feet per second imposed by FERC, and is also available to serve as an emergency spillway when the river flow is higher than station capacity.[7] The minimum flow requirements established by

FERC are essential to a safe and efficient management of the water supply and are designed to accomplish five operational goals: (1) to provide navigation up and down the river, (2) to protect the well-being of wildlife and the surrounding ecosystem, (3) to allow for the operation of other generation plants downstream, (4) to ensure adequate dilution of effluent discharges, and (5) to ensure adequate water for local irrigation needs. In contrast with the fishway, the recreational facilities that plaintiff was required to provide have no water management functions and do nothing to further the five operational aspects listed above. It is for precisely these reasons that the Vernon dam fishway is integral to the furnishing of electrical energy, while the various recreational facilities are not.

In concluding that the Vernon dam fishway is an integral part of the Vernon dam, the Court is aware of the contrary position of the Internal Revenue Service, as stated in Rev.Rul. 73–466, 1973–2 C.B. 52. In that revenue ruling, the Internal Revenue Service held that fish preservation facilities were not an integral part of furnishing electrical energy because they were not "essential to the generating or furnishing of electrical energy within the meaning of section 1.48–1(d)(4) of the regulations." Rev.Rul. 73–466, 1973–2 C.B. at 53. Unfortunately, this Court cannot agree with this reasoning of the Internal Revenue Service as contained in this Revenue Ruling. Under the Code, "section 38 property" includes tangible property "used as an integral part of * * * *furnishing* * * * electrical energy * * *." 26 U.S.C. § 48(a)(1) (1976). A reading of Rev.Rul. 73–466 suggests that the Internal Revenue Service may have equated the term "furnishing" with the narrower term "generating." Although the Vernon dam fishway does not perhaps enhance NEP's ability to actually generate electricity, it is an integral part of the overall furnishing of electricity for all of the reasons discussed above. Therefore, notwithstanding the stated position of the Internal Revenue Service, it is this Court's

7. When it is operational, the fishway passes an additional 368 cfs of water, which amounts to 29 percent of the minimum flow requirement of 1250 cfs.

decision that the Vernon dam fishway is used directly in the activity of furnishing electricity and is essential to the completeness of the dam in furnishing the electricity. *See* Treas.Reg. § 1.48–1(d)(4) (April 1, 1980).

## CONCLUSION

For all of the reasons stated above, the defendant's motion for summary judgment is denied, and the plaintiff's cross-motion for partial summary judgment as to the liability issue involved here is granted. In the event the parties are unable to stipulate as to the exact amount of the refund due the plaintiff within 30 days, the parties are to advise the Court by joint status report and further proceedings will be scheduled.

